INTERSTATE COMMERCE COMMISSION ᴇᴛ ᴀʟ.
*v.* COLUMBUS & GREENVILLE RAILWAY CO.

No. 628. Argued April 7, 8, 1943. Reargued May 13, 1943.—Decided June 7, 1943.

*Mr. Daniel W. Knowlton,* with whom *Mr. Daniel H. Kunkel* was on the brief, for the Interstate Commerce Commission; and *Mr. John E. McCullough* argued the cause on the original argument and *Mr. Elmer A. Smith* on the reargument (*Messrs. Erle J. Zoll, Jr.,* and *M. G. Roberts* were with them on the brief) for J. M. Kurn et al.,—appellants.

*Messrs. Robert C. Stovall* and *Forrest B. Jackson* for appellee.

Mr. Justice Jackson delivered the opinion of the Court.

This case is here on direct appeal from a decree of a specially constituted District Court of three judges[1] enjoining the enforcement of an order of the Interstate Commerce Commission cancelling certain "cut-backs" on cottonseed and its products contained in appellee's I. C. C. Tariff No. 81.[2]

The appellee operates 168 miles of railway extending east and west within the State of Mississippi. Cottonseed and its products, to which the tariff in question relates, are important items of traffic in the region, and there are cottonseed mills at a number of points on appellee's line. Appellee originates about 15 or 20 per cent of the cottonseed milled there; trucks originate about 50 per cent; and the balance comes to the mills on other lines with which the appellee connects at these points, including the Illinois Central Railroad Company, the Mobile & Ohio Railroad Company, the St. Louis-San Francisco Railroad Company, and the Yazoo & Mississippi Valley Railway Company.

Since 1931, these railroads and appellee have maintained a system of cut-backs originally designed, and successively revised, for the purpose of meeting the competition of truck lines. Speaking generally, the system permitted one who shipped cottonseed into the mill point and paid the full local rate for that inbound haul to receive back part of the amount so paid if he later shipped the product outbound by the same carrier. If the outbound haul was not by the carrier that had made the inbound haul, he was not entitled to the cut-back.

---

[1] Urgent Deficiencies Act of October 22, 1913, 38 Stat. 208, 220, 28 U. S. C. §§ 47, 47a; § 238 of the Judicial Code as amended, 28 U. S. C. § 345.

[2] 248 I. C. C. 441; 46 F. Supp. 204.

To better its position with respect to the outbound hauls of cottonseed originated by other lines, appellee took measures which it calls "self-help to meet competition." It sought by its I. C. C. Tariff No. 81 to establish schedules of payments to shippers which would give them the benefit of the cut-backs on cottonseed and its products shipped outbound over its line, whether the inbound haul was over its own line or over a connecting line. This tariff was neither protested nor suspended, and became effective October 16, 1938. After the Commission's Bureau of Traffic had criticized this tariff and requested its correction, appellee filed its I. C. C. Tariff No. 83, differing in immaterial particulars from its Tariff No. 81. The Commission ordered No. 83 suspended and entered upon an investigation of its lawfulness.[3]

In its report,[4] Division 3 of the Commission held: The suspended tariff was an effort to reduce the outbound joint rates, established to points beyond appellee's line with the concurrence of the participating carriers, without obtaining their concurrence in such reduction, and therefore it violated § 6 (4) of the Act.[5] The suspended schedules did not "lawfully name or provide any legal rates whatsoever," [6] and were in violation of § 6 (7),[7] since the con-

---

[3] § 15 (7) Interstate Commerce Act, 49 U. S. C. § 15 (7).

[4] 238 I. C. C. 309.

[5] "The names of the several carriers which are parties to any joint tariff shall be specified therein, and each of the parties thereto, other than the one filing the same, shall file with the commission such evidence of concurrence therein or acceptance thereof as may be required or approved by the commission, and where such evidence of concurrence or acceptance is filed it shall not be necessary for the carriers filing the same to also file copies of the tariffs in which they are named as parties." 49 U. S. C. § 6 (4).

[6] 238 I. C. C. at 315.

[7] "No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the

templated "refund would be, essentially, a rebate, whereby the property would be transported from the mill point to the destination on another line at a lower rate than that named in the joint tariff published and filed by the several carriers participating in the movement and lawfully in effect. . . . Respondent's suspended tariff, granting an alleged allowance to the shipper notwithstanding that he performs no part of the transportation service, as the result of which he would obtain the out-bound transportation at less than the rates lawfully in effect would constitute an unreasonable practice, in violation of section 1 (6)[8] and other provisions of the Interstate Commerce Act." [9] Although not shown to be unlawful as applied to traffic originated and carried to the mills by appellee over its line, the tariff was defective in the proposed form, and should be cancelled.

The Commission then of its own motion entered upon an investigation of the lawfulness of appellee's I. C. C. Tariff No. 81, which had remained in effect as the result of the suspension of No. 83.

---

same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs." 49 U. S. C. § 6 (7).

[8] "It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce . . . just and reasonable regulations and practices affecting classifications, rates, or tariffs, . . . and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful." 49 U. S. C. § 1 (6).

[9] 238 I. C. C. at 317–318.

The brief and not altogether clear opinion of the full Commission concluded with the statement that "We find that, to the extent respondent's tariff I. C. C. No. 81 provides for refund, or cut-back, to the shipper on traffic originated and hauled to the mill points by other rail carriers, it is unlawful in violation of section 1 (6), section 6 (4), and section 6 (7) of the Interstate Commerce Act."[10] From this and other statements contained in the opinion of the full Commission it appears that the Commission shared the views of Division 3 as to the effect of the schedule upon the outbound joint rates and the unlawfulness of that effect. The Commission's view that the tariff operated to reduce such outbound rates without the concurrence of the participating carriers is at least a tenable one, and one we are not disposed to gainsay. When that view is taken, violation of § 6 (4)[11] is clear. With the impropriety of the tariff under § 6 (4) established, the Commission could reasonably conclude that its operation entailed violations also of §§ 1 (6) and 6 (7).[12]

Disregard of the statutory requirements for the establishment of joint tariffs may have important substantive consequences. The Interstate Commerce Act contemplates that joint railroad rates shall be established only by concurrence of the participating carriers or by the Commission in proceedings under § 15.[13] In the exercise of its power under § 15 to fix joint rates without the concurrence of the participating carriers, the Commission is required by § 15 (4) to protect, in stated circumstances, the long hauls of participating carriers, and to give reasonable preference to originating carriers.[14] The appellant railroad carriers

---

[10] 248 I. C. C. at 446. For the texts of §§ 1 (6), 6 (4) and (7), see footnotes 8, 5 and 7, *supra*.

[11] For the text, see footnote 5, *supra*.

[12] For the texts, see footnotes 8 and 7, *supra*.

[13] § 15 (3), 49 U. S. C. § 15 (3).

[14] "In establishing any such through route the Commission shall not (except as provided in section 3 of this title, and except where one of the

claim, with what foundation we do not decide, to be entitled to protection in both regards, and that to deny them such protection may force the abandonment of branch lines which Congress sought by amendment to § 15 (4) to avoid. It is said that in recent years the Illinois Central System has already abandoned branch lines in Mississippi having greater mileage than the whole of appellee's line.[15] Division 3 found that the existing cut-back rates were "extremely low, averaging only about 8.5 percent of the first-class rates, whereas in the general cottonseed proceeding the Commission prescribed 18.5 percent of first class as reasonable, and that these low cut-back rates cán be justified only in consideration of the in-bound carrier's obtaining the out-bound movement." [16] The full Commission reiterated Division 3's further finding that "Instead of

carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs. . . ." 49 U. S. C. § 15 (4).

[15] See, e. g., Abandonment of Line By Mississippi Valley Co. and Illinois Central R. Co., 145 I. C. C. 289; Abandonment of Branch Line By Y. & M. V. R. Co., 145 I. C. C. 393; Helm and Northwestern Railroad Co. Abandonment, 170 I. C. C. 33; Gulf & Ship Island R. Co. Abandonment, 193 I. C. C. 749; Y. & M. V. R. Co. Abandonment, 249 I. C. C. 561; Y. & M. V. R. Co. Abandonment, 249 I. C. C. 613.

[16] 238 I. C. C. at 314.

placing itself on an equal basis with its competitors, respondent's present effective and suspended tariffs place it in a more favorable position than any of them, since the tariffs of none of them go so far as to grant a refund to the shipper on traffic moving into the mill over the line of another carrier." [17]

Although it appears that by far the greatest part of the outbound traffic over the appellee's line moves beyond on the lines of connecting carriers at jointly established rates, it appears that some traffic does reach its ultimate destination at points along appellee's line. It was apparently with reference to this traffic that the Commission stated that "the form and manner in which respondent's tariff is published clearly does not conform to the requirements of section 6 (1)," [18] which provides, *inter alia*, that "If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection . . . the separately established rates, fares, and charges applied to the through transportation." [19] The challenged tariff provided that upon shipment outbound over appellee's line "the freight charges . . . to the manufacturing or mill point will be reduced" in stated amounts, although such charges had been made by other carriers in accordance with their own tariffs for transportation over their own lines. That the Commission may hold that a carrier in "separately establishing" its rates for a portion of a through haul must not purport to alter the rates established by connecting lines, surely is a permissible construction of § 6 (1).

Whether cut-backs even as applied to previous transportation over the carrier's own lines are ever permissible under the Act, we do not decide; and, like the Commission,

[17] 238 I. C. C. at 313; 248 I. C. C. at 445.

[18] 248 I. C. C. at 445.

[19] 49 U. S. C. § 6 (1).

we express no opinion whether the particular cut-backs employed by appellee's competitors are valid. We simply hold that, whatever may be the appellee's rights in appropriate proceedings, cf. *Atchison, T. & S. F. Ry. Co.* v. *United States,* 279 U. S. 768, the appellee may not realize upon them by means which the Commission has properly found to be unlawful.

*Reversed.*

MR. JUSTICE DOUGLAS, concurring:

Commissioner Splawn dissented from the report of the Commission in this case. 248 I. C. C. 441, 446–447. He noted that respondent's tariff "in no wise · affects the amount of the rates paid for the inbound service to the mill point," its only effect being to "reduce the outbound rate and thus make applicable the same rate as applies when the outbound haul is performed entirely by the trunk lines." In his view, the outbound traffic is "free" traffic, as that term was used in *Atchison, T. & S. F. Ry. Co.* v. *United States,* 279 U. S. 768. That is to say, "it is traffic which has previously moved in on local or joint rates to the milling point and has there come to rest." Hence the fact that respondent is not a party to the inbound rates is "without legal significance." Commissioner Splawn concluded that the decision of the Commission violated "all principles of justness and fairness as it precludes respondent from participating in the outbound movement or in the through movement of the traffic from common origins on an equality of rates with the trunk lines." The fact that no other carrier is a party to respondent's tariff containing the cut-back provision and that respondent absorbs the allowances out of its proportion of the joint outbound rate was unimportant in his view. As he stated, "The identical facts are true of the tariffs and practice of at least one of the intervening trunk lines"—tariffs which concededly constituted

the necessity for respondent's tariff. Moreover, as he observed, "there can be no doubt that the provision is lawful as to outbound traffic to points reached by respondent over its line." That traffic would seem to be as "local" as the transit privilege which this Court held in *Central R. Co. of New Jersey* v. *United States,* 257 U. S. 247, a carrier might establish for its individual tariff, even though there was a joint through route with joint rates. So I would be inclined to support the judgment of the court below in setting aside the order of the Commission at least to the extent that the court allowed the tariff to apply on outbound traffic to points on respondent's own line.

But I am voting for a reversal of the judgment of the court below in the view that the case should be returned to the Commission for adequate findings.

Although there are two reports on this problem—one by the full Commission and one by a division of the Commission—they have an obscurity and vagueness which two full arguments before this Court have not dispelled. Commissioner Splawn complained without success of the lack of findings under § 1 (6), § 6 (1), and § 6 (4). But if we pass by those deficiencies and cut and sew the meager materials at hand into the pattern which we guess the Commission had in mind, there are still important questions left unanswered. (1) The tariffs containing the joint outbound rates specifically authorize "privileges, charges and rules" to be covered by separate tariffs even though the joint or through rate is affected, provided the carrier granting the privilege does so upon its own responsibility and at its own cost. We are not informed why that provision does not authorize appellee's proposed tariff at least to the extent that it applies to outbound traffic to points on appellee's line. (2) If concurrence of the other carriers to appellee's tariff is necessary, we are not told why the foregoing provision of the joint tariff is not

adequate. (3) In case that provision of the tariff covering joint rates is not applicable, there is another phase of the problem which is in the dark. The Commission does not seem to deny that this traffic was "free" traffic within the rule of *Atchison, T. & S. F. Ry. Co.* v. *United States, supra.* It was merely concerned with the "form and manner" of the tariff. But we are not told why appellee's tariff is not within the rule of *Central R. Co. of New Jersey* v. *United States, supra,* so far as the tariff specifies the rate from milling points to destinations on appellee's line. The rule governing the right of carriers to initiate rates has not changed. *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 506.

Mr. Justice Cardozo speaking for the Court stated in that case, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." 294 U. S. p. 511. That was said about another obscure and vague report of the Interstate Commerce Commission. We should say the same thing about the present report. The questions left unanswered by this report may be simple ones to experts. But we should have those answers before we put the imprimatur of this Court on the Commission's order.

Mr. Justice Black, Mr. Justice Murphy, and Mr. Justice Rutledge join in this opinion.