381 F.2d 473
 Arsenio J. CASELLA, Appellant,
v.
NORFOLK AND WESTERN RAILWAY COMPANY and the Baltimore and Ohio Railroad Company, Appellees.
FRANK M. SAYFORD COMPANY, Appellant,
v.
NORFOLK AND WESTERN RAILWAY COMPANY and the Baltimore and Ohio Railroad Company, Appellees.
 No. 9716.
 No. 9717.
 United States Court of Appeals Fourth Circuit.
 Reargued May 3, 1967.
 Decided June 22, 1967.
 
 William A. Blank, Brooklyn, N. Y. (Thomas C. Elder, Staunton, Va., on brief), for appellant, Casella.
 John H. Locke and William R. Rakes, Roanoke, Va. (Gentry, Locke & Rakes, Roanoke, Va., on brief), for appellant, Frank M. Sayford Co,
 Edw. R. Slaughter, Jr., Charlottesville, Va. (Richard L. Williams, Richmond, Va., and Battle, Neal, Harris, Minor & Williams, Charlottesville, Va., on brief), for appellee, Norfolk & W. R. Co.
 J. Sloan Kuykendall, Winchester, Va. (Kuykendall & Whiting, Winchester, Va., on brief), for appellee, The Baltimore & O. R.R. Co.
 Before HAYNSWORTH, Chief Judge, and WINTER and CRAVEN, Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 Summary judgment, we conclude, was appropriately entered for the railroads in this tort action for personal injury brought by an employee of the consignee against the consignor, the originating carrier and a connecting carrier, in which the consignor also claimed indemnity from the receiving railroad.
 
 
 2
 The plaintiff was severely injured when struck on the head by a machinepressed bale of waste paper. He and two others had just opened the door of a box car laden with such bales, when one of them tumbled from the top tier, through the open door, and struck the plaintiff. The plaintiff has evidence that there was only one metal strap intact to protect the door opening.
 
 
 3
 This action was brought in the Western District of Virginia against the shipper and two railroads upon claims of negligence in loading and transporting the car. Each defendant denied its own negligence and asserted contributory negligence of the plaintiff. The shipper, denying its negligence, attempted to implead the plaintiff's employer upon allegations that in the loading it followed the consignee's instructions and requirements. It also sought indemnity from the originating railroad on the theory that it had furnished no instructions as to proper loading techniques and had failed to perform a claimed duty of inspection of the load. The railroads, in turn, sought indemnity from the shipper.
 
 
 4
 Thereafter, there were extensive pretrial proceedings. Interrogatories were filed and answered and depositions of the prospective witnesses were taken. These exposed the legal contentions of the parties and lead the District Court to the conclusion, after hearing the railroads' motions for summary judgment, that, as to them, there was no material issue of fact to be tried either as to the plaintiff's claim or as to the shipper's claim of indemnity. We agree.
 
 
 5
 Frank M. Sayford Company had a plant at Buena Vista, Virginia, in which it manufactured paper products. Its waste paper, during the relevant period, it sold and shipped to Prospect Street Paper Stock Co. of Brooklyn, New York, owned by Conrad Casella, the plaintiff's brother. For a time, these shipments moved by truck, but, approximately one year before the accident, the parties substituted shipment by rail. Conrad Casella came from Brooklyn to Buena Vista at that time to instruct Sayford's employees as to the proper method of loading the baled waste paper into box cars and providing adequate door protection. Thereafter, forty-two such cars of waste paper were moved by rail from Buena Vista to Brooklyn. Each was loaded by Sayford, and, according to Sayford, the loading was done in accordance with Casella's instructions and requirements.
 
 
 6
 The car in question was loaded by Sayford with 86 bales of paper, and its doors were closed. Thereafter, an agent of the Norfolk and Western Railway Company placed seals on the doors. The car was picked up and transported by the Norfolk & Western to Shenandoah Junction, West Virginia, where it was delivered to the Baltimore & Ohio Railroad Company. The B & O moved the car through its Brunswick and Baltimore, Maryland yards to Park Junction in Philadelphia, Pennsylvania, where it delivered the car to the Reading Railway System. The Reading delivered the car, directly or indirectly, to Brooklyn Eastern District Terminal, the delivering carrier.
 
 
 7
 There was a stipulation by the parties that the case should be decided under the laws of New York, where the injury occurred. Insofar as the laws of the states are applicable, the stipulation may reflect a correct resolution of the choice of law question, but the result is unfortunate for the plaintiff's claim against the railroads, since the leading case against him is a decision of New York's Court of Appeals.
 
 
 8
 In Lewis v. New York, O. & W. Ry., 210 N.Y. 429, 104 N.E. 944 (1914), Cardozo writing for the court, it was held that a railroad was not responsible for a shipper's improper loading of a bulk commodity which caused injury to an employee of the consignee. In that case, the plaintiff was injured when, after delivery of a carload of baled hay, he pried the car's door open and one of the bales toppled from the top tier and struck him. The bales had been stacked precariously end on end and the doorway protection was clearly inadequate. Negligence there was in the loading, but the loading had been done by the consignor. The railroad's duty was limited by the court to the safe transportation of the loaded car; it was held under no duty to supervise or inspect the consignor's loading or to vouch for its safety.
 
 
 9
 Doubtless, Lewis should not be read so broadly as to negate a duty on the part of a railroad of warning the consignee and his employees of unexpected dangers in the loading of which the railroad has actual knowledge, but there is no basis here for a finding that either railroad knew that Sayford's provision of doorway protection was inadequate or that either had any reason to suspect that it was. The doors were closed by Sayford. An employee of Norfolk & Western placed the seals upon the doors without opening them, as was customary, and the seals, of course, were intact when the car was delivered to the consignee in Brooklyn. Forty-one cars of baled paper had moved previously from the same consignor to the same consignee, and, presumptively, had been found by the consignee to have had adequate door protection.[1] At least, the railroad had no notice of any deficiency in the loading of those cars.
 
 
 10
 The Lewis principle has been applied in New York in more recent times. In Rocco v. New York Central Sys., 7 Misc. 2d 286, 166 N.Y.S.2d 371 (1957), it was held that a delivering carrier was under no duty to open a car and inspect the load to guard against injury of an employee of the consignee upon opening the door. The Lewis principle has been consistently recognized elsewhere in exonerating railroads from liabilities to employees of consignees injured upon opening the car's door by falling cargo, which had been loaded by the shipper.[2] With respect to bulk commodities loaded by the consignor, a railroad's duty to employees of a consignee appears to be limited to the correction of defects observable upon a reasonable inspection of the exterior of the car from the ground,[3] unless, of course, it has created,[4] or has actual knowledge of, a latent defect.
 
 
 11
 The plaintiff and Sayford, in support of its cross claim, would have us find, on the part, at least, of the originating carrier, a duty of supervision and inspection of the consignor's loading, in § 1 ¶ (6) and § 8 of the Interstate Commerce Act. Those sections are set forth in the margin,[5] but we find in them no such duty.
 
 
 12
 The purpose of the Interstate Commerce Act of 1887 was the elimination of discrimination in transportation services and the elimination of unjust and unreasonable rates, classifications and rules.[6] Evasive practices contrary to the purposes of the original act developed, and they prompted passage of the Elkins Act in 1911. The Elkins Act introduced § 1 ¶ (6) in substantially its present form to clearly proscribe artifices employed to achieve discriminations and unreasonable preferences in violation of the purpose of the original Interstate Commerce Act. It had nothing to do with protection of consignees and their employees from the physical hazards of improperly loaded commodities. Applied in a variety of contexts to effect its antidiscriminatory purpose,[7] it has never before been thought to have the meaning which the plaintiff and Sayford would now read into this hoary section of well understood compass. A tariff statute of such vintage is not easily converted into a safety statute for the protection of consignees against the risk of personal injury.
 
 
 13
 The cases against the railroads are not assisted by the general requirement of their rules that consignors, at their expense, must load freight moving at carload rates and provide adequate door protection when there is a possibility of lading coming in contact with the doors or falling through an open door, by their circulation of pamphlets describing proper loading methods for various commodities, including provision of proper door protection, or by their supporting membership in the Southern Weighing and Inspection Bureau.
 
 
 14
 The Norfolk & Western's rules, except where the applicable tariff otherwise provides, clearly place the duty and economic burden of loading upon the shipper of carload lots, and loading includes provision of such dunnage and door protection as may be necessary to make the freight secure for shipment. Those rules are not an assumption of duties by the railroad; they are a negation of them. There is no intimation in them of railroad responsibility for deficiencies in a shipper's loading or for supervision of it. They contain no promise or warranty; they place the entire burden of loading, with necessary protective measures, on the shipper.
 
 
 15
 Pamphlets descriptive of proper loading practices are available upon request of the Norfolk & Western, and, upon request of a shipper encountering loading problems or difficulties, agents of the railroad will respond with any helpful suggestions that may have been derived from their experience. There is in these circumstances, however, no implication of railroad responsibility to see that a shipper's loading crew knows the proper procedures and carefully follows them. The fact that the railroad willingly responds to a plea for assistance cannot be converted into an affirmative duty to extend unsolicited instruction and to exercise a controlling supervision. If the railroad had been aware that Sayford's loading practices were dangerously deficient, we would have a different case, but the safe transit of forty-one cars loaded by Sayford without complaint from the consignee was a strong indication to the railroad that Sayford was knowledgeable and efficient.
 
 
 16
 The Southern Weighing and Inspection Bureau is an organization serving some eighty-one railroads operating in the territory east of the Mississippi and south of the Ohio and Potomac Rivers. It is financed by the railroads. It has its headquarters in Atlanta, Georgia, and it has representatives scattered throughout the territory. Its general purpose is defined by its Articles to be:
 
 
 17
 The purpose of the Bureau shall be to obtain, through inspection and supervision, correct and uniform weighing, classification, marking and packing of freight; the establishment and supervision of weight agreements with shippers and consignees; the policing of transit privileges; and the performance of such other duties incidental to these purposes as may be required by the membership.
 
 
 18
 One of the activities of the Bureau includes the random inspection of the loading of fragile freight subject to damage in transit. This is accomplished by unscheduled visits to shipping platforms of consignors of carload lots of such freight, and advice and assistance are lent to such shippers. The purpose of this activity is the reduction in freight loss and damage. There is no available evidence that agents of the Bureau ever inspected, or policed in any way, shippers' loadings of carload lots of rough commodities not subject to transit damage;[8] there is substantial available evidence to the contrary.
 
 
 19
 It is thus apparent that the claim of a duty on the part of Norfolk & Western to inspect and supervise the loading of these bales of waste paper must fail. The statute does not impose such a duty. No contract requires it. Sayford knew its cars were being sealed without an inspection of the lading by the railroad, and the railroad had made no contrary representation to Casella. The claim that the B & O should break the seals on such a car to inspect the lading is not seriously asserted; it would be frivolous if it were.
 
 
 20
 The present case, therefore, is far from the principle of General Electric Co. v. Moretz, 4 Cir., 270 F.2d 780.[9] It is made plain in Moretz that the Interstate Commerce Commission's regulations require the trucker, unlike the railroad, to inspect the lading and to take affirmative steps to correct any deficiency. Even more importantly, the truckers in Moretz and in Savage had actual knowledge of the dangerous insecurity of the lading. It is precisely because it did not create the dangerous condition,[10] knew nothing of it and was under no statutory or contractual duty to inform itself of the security of the door protection that Norfolk & Western cannot be held responsible for its insufficiency.
 
 
 21
 In his original pleading, Casella claimed against the two railroads upon alternative allegations of negligence in the carriage. Had he also joined the delivering carrier and the Reading, the other connecting carrier, he might have placed himself in the enviable position, in the event, however unlikely it might be, that Sayford could prove that its door protection was adequate, of casting a heavy burden of exoneration upon the railroads, analogous to that an originating or delivering carrier must bear, for all of the railroads involved, when defending claims for loss of, or damage to, freight in transit.[11] The plaintiff assumed a burden of proof of negligence on the part of the two railroads he chose to join without the benefit of any presumption which might have arisen if the defendant railroads had been in exclusive control and possession of the car from the time of the shipper's delivery of the car to the originating carrier to the time of the consignee's receipt of the car from the delivering carrier. Then he entered into a stipulation that there was no negligence on the part of Norfolk & Western in the carriage. Reliance was limited to a speculation that there was an unnecessary switching operation on the B & O.
 
 
 22
 That speculation is that, when the car reached the B & O's Brunswick, Maryland yards, it was mistakenly classified as westbound. If it was, it would have been switched to the westbound classification yard, from whence, upon discovery of the error, it would have been switched again to the eastbound classification yard. The contention is cast in terms of "humping," which means no more than that the switching operation was in a modern, gravity actuated classification yard, through many of which every car must pass in its normal transit by a succession of carriers through a series of yards. The B & O answered that it did not know whether or not the car was misrouted when it first arrived at its Brunswick, Maryland, yards. It produced its records which do not support the plaintiff's speculation, though, by the B & O's admission, they do not refute it, either. The plaintiff has no other evidence to support its speculation, but even if it was proven that the car was switched once more than ordinary carriage required there would still be no proof that one extra switching movement could or did destroy the door protection. Apart from his speculation, the plaintiff claims to have no available evidence of any fault on the part of B & O which might have been a proximate cause of his injury.
 
 
 23
 Under the circumstances, with all available evidence disclosed, with a stipulation that there was no negligence on the part of Norfolk & Western in the carriage and limitation of the claim against B & O to an unprovable speculation, the District Court properly concluded that there was no triable issue of fact. Since it also properly held that neither railroad was under a legal duty to inspect the lading, summary judgment for the railroads was appropriate on both the primary and cross claims.
 
 
 24
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 If they had not had it, the plaintiff will have great difficulty in avoiding Sayford's defense of contributory negligence
 
 
 [2]
 Butler v. Norfolk S. Ry., E.D.N.C., 140 F.Supp. 601 (1956) (a roll of paper); Seeden v. Great No. Ry., 242 Minn. 360, 65 N.W.2d 178 (1954) (a roll of paper); Butler v. Central of Georgia Ry. Co., 87 Ga.App. 492, 74 S.E.2d 395 (1953) (a roll of paper, the same occurrence involved in Butler v. Norfolk S. Ry., supra)
 
 
 [3]
 See the cases cited in the preceding footnote. See also Ambrose v. Western Maryland Ry. Co., 368 Pa. 1, 81 A.2d 895 (1951); Gulf, W. T. & P. Ry. v. Wittenbert, 101 Tex. 368, 108 S.W. 150, 14 L.R. A.,N.S., 1227 (1908)
 
 
 [4]
 Norfolk & Western Railway Company v. Anderson's-Black Rock, Inc., 4 Cir., 350 F.2d 917
 
 
 [5]
 § 1, par. (6). Classification of property for transportation; regulations and practices. It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing aand delivering property for transportation, the facilities for transportation, the carrying of personal, sample and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful
 * * * * *
 § 8. Liability in damages to persons injured by violation of law. In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.
 
 
 [6]
 United States v. Baltimore & O. R. R., 333 U.S. 169, 175, 68 S.Ct. 494, 92 L.Ed. 618; Mid-state Horticulture Co. v. Pennsylvania R. R., 320 U.S. 356, 361, 64 S.Ct. 128, 88 L.Ed. 96; United States v. Union Stock Yard & Transit Co. of Chicago, 226 U.S. 286, 307, 33 S.Ct. 83, 57 L.Ed. 226; Interstate Commerce Commission v. Baltimore & O. R. R., 145 U.S. 263, 276, 12 S.Ct. 844, 36 L.Ed. 699
 
 
 [7]
 American Trucking Associations, Inc. v. Atchison, Topeka, and Santa Fe Ry., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 1967); United States v. Interstate Commerce Commission, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949); Interstate Commerce Commission v. Columbus & G. Ry., 319 U.S. 551, 554, 63 S.Ct. 1209, 87 L.Ed. 1580 (1943); Northern Pac. Ry. v. United States, 316 U.S. 346, 62 S.Ct. 1166, 86 L.Ed. 1521 (1942); Missouri Pac. R. R. v. Stroud, 267 U.S. 404, 407 45 S.Ct. 243, 69 L.Ed. 683 (1925); United States v. New River Co., 265 U.S. 533, 541, 44 S.Ct. 610, 68 L.Ed. 1165; T. Mendelson Co. v. Pennsylvania R. R., 332 Pa. 470, 2 A.2d 820, 822 (1938)
 
 
 [8]
 Conrad Casella, in a deposition, testified that a number of years earlier, the Brooklyn Eastern District Terminal's agents would not sign a bill of lading for a car loaded at one of its terminals — not on a shipper's siding — unless the doors were open and the door protection had been inspected by a "yard man." Proof of Brooklyn's practices many years earlier in supervising the loading of cars on its tracks in its terminals creates no triable issue of Norfolk & Western's proven practice of accepting without inspection carload lots of rough commodities loaded on shippers' sidings
 
 
 [9]
 See also, United States v. Savage Truck Line, Inc., 4 Cir., 209 F.2d 442, 44 A.L.R. 2d 984
 
 
 [10]
 Cf. Norfolk & Western Railway Company v. Anderson's — Black Rock, Inc., 4 Cir., 350 F.2d 917
 
 
 [11]
 See 49 U.S.C.A. § 20(11). With respect to freight moving under through bills of lading, an earlier common law reached the same result in terms of principles of agency. The foundation of this doctrine is contractual; in this tort action, the plaintiff has not sought its cloak. In its cross-action, Sayford has made no attempt to invoke it