**AJAYEM LUMBER CORP., Plaintiff,**

v.

**PENN CENTRAL TRANSPORTATION CO. et al., Defendants.**

**The LONG ISLAND RAILROAD COMPANY, Third-Party Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Third-Party Defendants.**

**PENN CENTRAL TRANSPORTATION CO. et al., Plaintiffs,**

v.

**The LONG ISLAND RAILROAD COMPANY, Defendant.**

**Nos. 69 C 1585, 69 C 1586.**

United States District Court, E. D. New York.

Aug. 24, 1972.

Speno, Goldberg, Moore & Margules, Mineola, N. Y., for plaintiff Ajayem Lumber Corp.; by H. Bradley Moore, Mineola, N. Y., of counsel.

George M. Onken, Jamaica, N. Y., for Long Island Railroad Co.; by Walter J. Myskowski, Washington, D. C., of counsel.

Jerome H. Shapiro, New York City, for Penn Central Transportation Co.; by Edward A. Kaier, Philadelphia, Pa., of counsel.

Raymond M. Zimmet, Washington, D. C., for Interstate Commerce Comm.

Lee A. Rau, Washington, D. C., for U. S. Dept. of Justice.

Robert A. Morse, U. S. Atty., E. D. of New York.

BARTELS, District Judge.

This action arises from the filing by the Traffic Executive Association-Eastern Railroads ("TEA–ER") of a master tariff increasing the joint freight rates [1] of the Long Island Rail Road ("LIRR") and plaintiff railroads by 6% allegedly without the authority of the LIRR. Underlying the present controversy is the claim of the LIRR that its divisions of joint rates are inadequate as evidenced by the complaint filed by it on August 20, 1969 with the Interstate Commerce Commission ("Commission"),[2] antecedent to the present action, seeking a change in the existing divisions of joint freight rates, which claim has not yet been decided. The LIRR, objecting to the 6% increase and claiming that the master tariff was filed on its behalf by TEA–ER without authority, refused to accept freight cars interchanged to it without receiving its local rates as its divisions of the joint rates.[3] To prevent irreparable injury to themselves and to the public, plaintiffs instituted this action to enjoin the LIRR from refusing (1) to accept freight cars tendered to it, and (2) to accept as its divisions of their joint rates the percentages and proportions previously established by mutual agreement until the Commission made its final determination in the LIRR's divisions complaint above described. Before proceeding to the issues here involved, some background of the controversy is necessary.

### Background

The LIRR is a member of the TEA–ER, an association of railroads, authorized by Section 5a of the Interstate Commerce Act ("Act"), 49 U.S.C. § 5b(6), and approved by the Commission, which executed an agreement with its members authorizing joint actions, sometimes termed "rate legislation" within the framework of the agreement. The agreement also provides, as Section 5a requires, that each member retains the right to take independent action by

---

1. Joint freight rates are applicable to shipments which must pass over the tracks of several different railroads, which rate is divided between the different railroads whose tracks the shipment uses according to a schedule established by agreement among the railroads involved. The share of each railroad in the joint rates is generally lower than a comparable local rate, i. e., that rate for shipments which travel over the tracks of only one railroad.

2. That proceeding is entitled "The Long Island Rail Road Co. v. The Ahnapee and Western Railway Company, et al." ICC Docket 35153.

3. This step would increase the LIRR's portion of the joint rates approximately threefold.

giving appropriate notice of its intended action either before or after any TEA–ER determination. Prior to May 1, 1907, the date on which the Commission freight-tariff rule became effective, there was no uniform rule followed by carriers in regard to concurrence in joint tariffs, and the publication of joint rates without the affirmative consent of connecting carriers was a common practice. If at that time a non-consenting carrier objected to the proposed rate it could file a notice of non-concurrence, described as a negative concurrence. This system was inadequate as it did not afford sufficient notice to shippers relying upon the file tariff. In addition, the practice was subject to abuse by non-consenting connecting carriers which would abide by the joint tariff for a time and later, when convenient, reject the same upon the claim that it had not concurred therein although such carrier was often shown to have accepted traffic and collected charges in accordance with such tariff up to the date of filing the notice of non-concurrence.

Tariff Circulars 14–A and 20, issued in 1907, were designed to eliminate the uncertainties of this negative concurrence practice. Rule 17 of Tariff Circular 14–A abolished negative concurrences, and Rule 52 of Tariff Circular 20 (49 CRF § 1300.52) provided that a carrier named a party to a joint tariff without authority was not bound thereby and must charge the previously effective rate. In other words, old negative concurrences were abolished in favor of affirmative concurrences. To facilitate the filing and publishing of tariffs by an association, such as TEA–ER, as agent on behalf of one or more of its members, the Commission authorized a

carrier to do so by filing with the Commission a limited or unlimited power of attorney or concurrence in accordance with the provisions and forms established in Rules 17, 18 and 19 of Tariff Circular 20 (49 CRF 1300.17, 1300.18 and 1300.19). Rule 26(b) provides that such powers of attorney and concurrences may be revoked on "not less than sixty days' notice by filing a notice of revocation with the Commission and serving at the same time a copy thereof on the agent * * *." Rule 26(c) provides that when the power of attorney or concurrence is revoked, corresponding revisions in the tariff must be made no later than the effective date stated in the tariff or else the previous tariffs remain effective.

Whenever a power of attorney or a concurrence is properly revoked by a carrier, the changes sought in the tariff must, pursuant to Section 15(1) of the Act, be filed, all persons given notice, and the carrier involved must subject its proposed rates to the statutory rate investigatory proceeding by the Commission. These new rules as well as the Act[4] were meant to guarantee to the public that once a local or joint tariff was filed with the Commission, the public might rely thereon in making their shipments, and that all carriers named in the tariff would be bound thereby until the tariff was changed pursuant to proper procedures.

There are on file with the Commission several powers of attorney from the LIRR appointing the TEA–ER as its tariff-filing agent, and several concurrences to freight tariffs filed by the Lehigh Valley Railroad. There are on file no revocations of these powers of attorney or concurrences. On October 7th

4. Section 15(1) of the Act provides that if, after a hearing, the Commission determines that any individual or joint rate is "unjust or unreasonable", it may prescribe just and reasonable rates. Section 15(3) of the Act provides that the Commission may, and whenever deemed in the public interest shall, after a full hearing upon a complaint or upon its own initiative, establish joint classifications and joint

rates. Section 15(7) of the Act provides that whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, the Commission shall have the authority to hold a hearing to determine the lawfulness of such newly filed joint rate and at such a hearing the burden of proof is upon the carrier proposing the change to establish that it is "just and reasonable."

the LIRR received notice from its representative who attended the meeting of the TEA–ER, that a joint increase in railroad revenues was discussed but the carriers could not agree on the amount of the increase. On October 9th the TEA–ER wrote a letter to the LIRR regarding the petition for joint rates to be filed on October 10th, notifying it that the TEA–ER assumed that the LIRR desired "to join with other railroads in the petition now being prepared for filing and the name of your company will be included as a petitioner. If this should be contrary to your desires, you may direct me to eliminate the name of your company and the petition will be amended accordingly." The petition sought a 6% increase in joint freight rates of the member railroads and was filed with the Commission on October 10th. However, the October 9th letter was not received by the LIRR until October 14th. In the meantime on October 10th there appeared in the New York Times a story that on that date the railroads would file a petition with the Commission seeking a 6% general increase in rates. After reading this story in the Times, the LIRR on the same day wired the TEA–ER and the Secretary of the Commission that it was not agreeable to the increase and did not desire to be made a party to the petition. This wire was not received until October 13th, after the petition had been filed.

The Commission, by special permission, dated October 14, 1969, after it had received the LIRR's telegram, nevertheless authorized the carriers in whose behalf the petition was filed to use the short form method of publication by filing a master tariff containing the 6% increase effective no sooner than November 18, 1969. Also by separate order the Commission initiated an investigation of the tariffs which was docketed as Ex Parte No. 262 Increase Freight Rates 1969. The master tariff, as originally filed on October 10th and issued on October 16th, became effective on November 18th but because of the telegram of the LIRR, the TEA–ER filed amendments to the tariffs exempting the 6% rate increase from any local rates or charges of the LIRR. The chief executive of TEA–ER explained his refusal to make any further amendments exempting the joint rates from the 6% increase on the ground that the action of the LIRR was unilateral, without the support of any connecting carrier, and in direct conflict with the instructions of all other participating railroads. On November 5th the LIRR filed with the Commission a protest and motion to reject or suspend the tariff insofar as it provided for an increased rate on traffic to and from the LIRR's points. On November 12th a suspension hearing was conducted by the Commission and by an order dated November 17th the Commission rejected the LIRR's protest and allowed the master tariff and the connecting link supplements to become effective on November 18th subject to investigation in Ex Parte No. 262. On December 1st the LIRR filed a petition for reconsideration of the order of November 17th, which was denied by an order dated December 29, 1969, "for the reason that sufficient grounds have not been presented to warrant granting the action sought." On the same day the LIRR sent telegrams to the chairmen of the various rate bureaus and to other railroads informing them that it would begin collecting its local rates as its divisions of the joint through rates.

After abortive attempts on the part of the plaintiffs to collect in advance joint freight rates with respect to shipments destined to LIRR and on the part of LIRR to require all shipments to points on LIRR billed collect, the plaintiffs attempted to adjust the dispute by a junction-point settlement which would substitute for the through revenue waybill, which generally accompanied freight cars in interchange, a memorandum waybill. Under this procedure, the LIRR could not ascertain the total freight charges due. Whereupon the LIRR refused to accept the tender of freight cars interchanged to it, accom-

panied only by a memorandum waybill, which refusal, plaintiffs allege, resulted in terminal congestion and deprived shippers and consignees of rail service in mid-December 1969. The shipper-consignee, Ajayem Lumber Corp., then instituted an action in this court for injunctive relief against all the railroads involved in the dispute (69 Civ. 1585), which in turn stimulated the connecting roads to institute the present action (69 Civ. 1586) against the LIRR.

After obtaining the agreement of the parties to resume service on a status quo basis, reserving to the LIRR the right of making a retroactive adjustment if its position was upheld, the court, recognizing the experience and expertise of the Commission, held that the right of the LIRR to collect its local rates as its divisions should, in the first instance, be resolved by the Commission and accordingly directed counsel to contact the Commission and submit for its consideration the following question:

"Whether the provisions of 49 CFR 1300.52 and Court and Commission decisions require or permit the Long Island Rail Road Company to take its local rates as its divisions of the joint through rates at the Ex Parte No. 262 level."

The Commission unanimously concluded, on February 2, 1970, that the question "must be answered, without qualification, in the negative" (337 ICC 247, at p. 255).

During the course of a subsequent hearing held by this court on February 26, 1970, the LIRR raised certain additional questions which, pursuant to the court's suggestion, were submitted by the LIRR to the Commission for consideration. The questions, as answered unanimously by the Commission on June 23, 1970, were as follows: [5]

1. "Under Rule 17 of Tariff Circular 20, may the Traffic Executive Association-Eastern Railroads, approved by the Commission in a proceeding pursuant to Section 5a, to whom the Long Island Railroad Company has granted power of attorney, lawfully change interline freight rates to and from points on the Long Island Rail Road, after having received notice from The Long Island Rail Road of its non-concurrence prior to the actual filing of the tariff changing the rates, even though the power of attorney has not been revoked pursuant to Rule 26(b)?" 337 ICC at 276.

The Commission answered this question as follows:

"Yes, because Long Island has not acted pursuant to rule 26 of Tariff Circular 20 to revoke the broad powers of attorney given by it to the Traffic Executive Association-Eastern Railroads, which powers authorize that association to act as Long Island's agent in publishing tariffs."

2. "Do rules 54 and 58 of Tariff Circular 20, as now in effect, require carriers to receive special permission from the Commission before publishing master tariffs and connecting-link supplements?" (337 ICC at 281)

While the Commission asserted that this question should be answered in the affirmative, it held that an application for special permission was included in a combined document entitled, "Petition In Re Proposed Increase and Freight Rates and Charges" and "Motion for Emergency Increase in Freight Rates and Charges" filed on October 10, 1969 on behalf of the LIRR and that in response

---

5. On April 20 and 21, 1971, an evidentiary hearing was held under 49 U.S.C. § 15 on the lawfulness of the 6% increase, which was discontinued with the consent of all parties involved. In its report of June 23, 1970, in which the above questions were answered, the Commission also concluded that the general increase effected by the master tariff as it applied to the LIRR, was lawful. 337 ICC 276, 285-286.

thereto the Commission had granted special permission to the parties named in the application, which included the LIRR. The latter claimed that its name was removed as a party from both the October 10, 1969 petition for and the grant of special permission by means of an amendment of December 11, 1969, authorized by the Commission pursuant to a petition filed on its behalf on November 10th. In response the Commission held that the deletion on December 11, 1969 of the LIRR as a party to the October 10, 1969 petition could not *nunc pro tunc* invalidate the special permission nor the tariff schedules filed in accordance therewith.

3. "Can a person holding a power of attorney pursuant to Rule 17 exercise greater rights than his principal in the establishment of rates?"

The Commission agreed that as an abstract proposition this question should be answered in the negative and that since the authority to publish and file the tariff schedules on behalf of the LIRR was found in the outstanding powers of attorney and concurrences, the implied argument of the LIRR was specious.

Thereafter, on September 4, 1970, the LIRR joined as third party defendants The United States of America and the Interstate Commerce Commission, alleging that the court should not review the Commission's order until the above-named were made parties, and alleging that the action of the Commission and the connecting railroads violated the antitrust provisions of Sections 5b(6) and 5b(9) of the Act, and seeking an order of the court annulling the Commission's order.

### Nature of Action

 At the outset, it should be made clear that this proceeding is not an action to review an order of the Commission and thus is not governed by the narrow scope of judicial review of an administrative agency decision. But *cf.* Seaboard Airline Company v. United States, 181 Ct.Cl. 719, 387 F.2d 651 (1967). In addition, the questions to be here decided are questions of law and do not invoke the primary jurisdiction of the Commission, nor are they subject to a Section 16(2) proceeding under the Act. The issues raised at the hearing before this court were presented to the Commission so that its expertise could be brought to bear upon the important and somewhat technical tariff questions involved. Because of the Commission's familiarity with conditions in the industry which it regulates, its rulings on these referral issues are entitled to great weight but in this case were not subject to the standard of review applicable when its primary jurisdiction is invoked. *Cf.* Rochester Tel. Corp. v. United States, 307 U.S. 125, 138–139, 59 S. Ct. 754, 83 L.Ed. 1147 (1939); Copperweld Steel Co. v. United States, 106 F. Supp. 283 (W.D.Pa.1952), affirmed per curiam, 344 U.S. 871, 73 S.Ct. 171, 97 L.Ed. 675, rehearing denied, 344 U.S. 900, 73 S.Ct. 275, 97 L.Ed. 696; General Motors Corp. v. United States, 324 F.2d 604 (6 Cir., 1963); Daugherty Lumber Co. v. United States, 141 F.Supp. 576 (D.Oregon 1956). In the last analysis, however, these issues are only ancillary to the question of whether the plaintiffs and the public are sustaining irreparable injury, entitling plaintiffs to injunctive relief because of the refusal of the LIRR to accept cars interchanged to it by the plaintiffs without payment of its local rates, in violation of the Commission's orders of November 17 and December 29, 1969 refusing to suspend the master tariff increase of the joint through rates of the plaintiffs and the LIRR. While the ultimate resolution of this question involves consideration of the merits of this controversy, it presently involves the determination of immediate and irreparable damage that might ensue if the LIRR were permitted to continue its employment of force when legal remedies existed to right its alleged wrongs. The LIRR had adequate remedies in the courts for its alleged grievances arising

out of the action of the TEA–ER and the Commission's orders (see Alton R. Co. v. United States, 287 U.S. 229, 53 S. Ct. 124, 77 L.Ed. 275 (1939); Copperweld Steel Co. v. United States, *supra*; and Interstate Commerce Commission v. Columbus & Greenville Ry. Co., 319 U.S. 551, 63 S.Ct. 1209, 87 L.Ed. 1580 (1943)), and consequently it was not justified in resorting to self-help by refusing to accept freight cars tendered to it in order to enforce its claims. See Tatum v. Blackstock, 319 F.2d 397 (5 Cir. 1963). For this reason alone an injunction should issue. In addition, however, the plaintiffs seek to enjoin the LIRR from refusing to apply the established agreed-upon basis of divisions of the joint through rates until a final determination by the Commission, and in defense the LIRR has denied the authority of the TEA–ER to file the joint rate increase in its behalf. Thus upon other grounds a consideration of the merits of the complaint was also necessary. The court has examined and weighed the same and has reached the following conclusions.

### The Effect of the Unrevoked Powers of Attorney

The power of attorney of the LIRR on file with the Commission appoints the TEA–ER its true and lawful attorney and agent, "to file in its name, place, and stead, (1) for it alone, and (2) for it jointly with other carriers, through its CENTRAL TERRITORY RAILROADS TARIFF BUREAU OR TRUNK LINE TERRITORY TARIFF BUREAU OR TRUNK LINE–CENTRAL TERRITORY RAILROADS TARIFF BUREAU, freight tariffs and supplements thereto, as required of common carriers by existing laws and regulations established thereunder. And does hereby give and grant unto its said attorney and agent full and unlimited power and authority to do and perform all and every act and thing above speci-

fied as fully, to all intents and purposes, as if the same were done and performed by the undersigned carrier itself, and does hereby assume full responsibility for the acts and failures to act of said attorney and agent."

The concurrence of the LIRR to freight tariffs filed by the Lehigh Valley Railroad contains a similar broad authority to file and publish freight tariffs.[6] Apparently it is conceded that the authority to file tariffs has no relation to rate legislation, which is accomplished by the rate-making associations or bureaus in accordance with a Section 5a proceeding. In considering the extent to which the LIRR is bound by the action of its agent, it is pertinent to repeat that the agreement of the Eastern Railroads, including the LIRR, specifically provides that when a party elects to take independent action, it must give notice of the action it intends to take before filing any tariff so that notice of such action might be published in a recognized traffic publication. Turning to the meetings of the TEA–ER, the LIRR had been notified on October 7th by its representative that an increase in rates was being discussed at the meeting, but no agreement had been reached. Although notified of a possible increase, the LIRR took no precautionary action as far as notifying the TEA–ER of its position. While it is true that the LIRR did not receive any notice of the proposed increase until the notice in the October 10th New York Times and received no official notice thereof until October 13th, it is also true that it was not until after the TEA–ER had filed on October 10th the master tariff rates that the TEA–ER received notice of the protest and non-joinder of the LIRR. The LIRR complains that in view of its telegraphic notice, the TEA–ER had no authority to file in its behalf the master tariff and accordingly it is not bound thereby. This assumes that the Commission's rules as to revocation of powers of attorney and concurrence are in-

---

6. In fact, in the concurrence the LIRR specifically "assents to and concurs in all freight tariffs and supplements thereto, filed by Lehigh Valley Railroad Company" and, furthermore, "makes itself a party thereto and bound thereby."

valid and that its telegraphic communication was a sufficient revocation. We disagree.

■ The authority given to the TEA–ER under the power of attorney continues until specifically revoked as provided in Rule 26 upon sixty days' notice. This is not an arbitrary or capricious rule, because revocation carries with it certain consequences as explained in Rule 26(c), which are important in the rate-making structure of the industry and the Commission's authority to regulate the same. Thus, if the LIRR had properly revoked its power of attorney or concurrence, it would have been compelled to file its proposed revised tariffs and subject the same to a hearing under Section 15(7) of the Act. This requirement strikes at the heart of the problem since the LIRR claims it would have been impossible for it to have revoked its power of attorney and to have filed a revised tariff before the proposed master tariff filed by its agent became effective. The answer to this argument is that when a carrier files a power of attorney or concurrence it does so with full knowledge of the sixty-day notice requirement for revocation and is deemed to agree thereto. Accordingly, it takes the risk of being bound by any action its agent takes with respect to filing tariffs which become effective before a sixty-day revocation can be filed.[7] Moreover, to permit the LIRR under these circumstances to revoke its power of attorney by a telegram without at the same time making a corresponding revision of the tariff or tariffs on sixty days' notice, would permit the LIRR to circumvent the regulatory scrutiny of its rate proposal. In addition, the Commission under Rule 58 could have shortened the time necessary for the revocation or amendment of its power of attorney if requested by LIRR. See American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 537, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). Finally, even though a carrier has not agreed to a

rate established by the rate-making bureau, it nevertheless is bound to protect, as far as shippers and the public are concerned, the tariffs filed by its authorized agent pursuant to a power of attorney.

■ Referring to the argument of the LIRR that the Commission, by its order of December 11, 1969 deleting the LIRR from the list of the petitioning carriers, automatically and retroactively nullified the special permission application filed in its behalf on October 10, 1969, the court agrees with the Commission's conclusion that the deletion could not *nunc pro tunc* remove the LIRR's name from the petition. But at the same time it is hard for the court to understand why at that late date the deletion was permitted. The court has considered the other arguments of LIRR and found them to be without merit.

*The LIRR was neither coerced nor deprived of its right to independent action under Section 5a of the Act*

■■ 49 U.S.C. § 5b(6) of the Reed-Bulwinkle Act, authorizing railroads to enter into a joint rate activity, expressly preserves to each carrier "a free and unrestrained right" of "independent action." The LIRR contends that the action of the TEA–ER and of the Commission over its objection has vitiated its right of independent action, in violation of this section. The government joins the LIRR in this argument. The court disagrees for the following reasons:

1. The joint increases were properly published and filed pursuant to the outstanding unrevoked powers of attorney and concurrences signed by the LIRR, and Section 5b(6), enacted in 1948, neither made nor required any changes in the Commission's prescribed forms of powers of attorney or concurrences or revocations.

2. The right of independent action was available to the LIRR under Article III, Section 12 of the Eastern Railroads Agreement executed October 20,

---

7. The court is not passing upon any legal claim the LIRR may have against TEA-ER for any breach of its agency agreement.

1948, to which the LIRR was a member, and pursuant to which the rate conference meeting was held, and at which each member carrier was entitled to be represented by its own responsible traffic officer.

3. The right of independent action was available to the LIRR by means of executing a revocation of the power of attorney as prescribed by the Commission's rules, which would have subjected any revision of tariffs to the Commission's scrutiny under Section 15(7).

4. The right of independent action was exercised when the LIRR on October 10, 1969 requested the TEA–ER to publish a supplement excluding LIRR's rates from the joint-rate increase, which, however, resulted in an exclusion of the increase only from LIRR's local rates.

5. The right of independent action was exercised by the LIRR on November 17, 1969 when it petitioned the Commission for suspension of the joint rate increases, which, after a hearing, was denied pending a further hearing held on April 20, 1970 under Section 15, after which the Commission concluded that the joint rates were fair and reasonable with respect to the LIRR.

The procedural requirements imposed by the Commission are not mere formalities because they are important not only for the notice they afford to all interested parties, but also because all rates, local and joint, whether agreed upon or established through the exercise of the right of independent action, are thereby subjected to the scrutiny of the Commission. While the Act intended to confer antitrust immunity upon rate agreements and the right of independent action was intended to prevent coerced rates,

neither was intended to free rates from the Commission's scrutiny and regulation, nor to grant any carrier the power to veto any adjustment in joint rates approved by the Commission. See Indiana Motor Rate and Tariff Bureau, Inc., 297 ICC 593, 600 (1955) and Central States Motor Common Carriers, 299 ICC 773 (1957).

There is nothing in Interstate Commerce Commission v. Columbus & Greenville Ry. Co., supra, relied upon by the government and also by the LIRR to the contrary, since the tariffs here filed were with the concurrence of the participating carriers and were subsequently subjected to the scrutiny of the Commission. The government additionally asserts that while any legislative modification of the common law principle of an agency revocation might be justified as necessary to prevent disruption of rate structures built on tariffs already agreed upon and filed under existing powers of attorney, such a legislative modification would not or should not be authorized to bind a carrier to rate increases filed over its strenuous objection. We believe such a modification, if indeed it can be so described, is equally justified in both cases. The authority to file joint tariffs effective in the near future should be subject to the same safeguards against midnight oral revocations as the authority to change tariffs already on file. This is particularly true when the demands and needs of the participating railroads for increased revenue are immediate and critically necessary to provide efficient railway transportation service consistent with the national transportation policy. Such tariffs are subject to the protective scrutiny of the Commission upon an investigation and a hearing under Section 15(7), such as was held with respect to the present tariffs in Ex Parte No. 262.[8]

---

8. LIRR argues that the hearing by the Commission on April 20 should have been held under Section 15(1) instead of Section 15(7). The standards used in both sections are the same and there is no reason for differentiation. See Ayrshire

Collieries Corp. v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1949), and ICC v. Columbus & Greenville Ry. Co., 319 U.S. 551, 63 S.Ct. 1209, 87 L.Ed. 1580 (1943).

In sum, the court agrees with the conclusion of the Commission that Congress in enacting Section 5a did not intend to give any carrier the right or power to veto an adjustment in joint rates if published and filed pursuant to outstanding authorizations issued to tariff-publishing agents and in concurrences issued to other carriers, unless such instruments were amended or revoked in accordance with regulations issued by the Commission in accordance with its responsibility to regulate rate structures in the public interest.

Therefore, the LIRR is hereby permanently enjoined from refusing to accept freight cars tendered to it upon the presently agreed upon basis of divisions of joint rates until the Commission makes its final determination in the case of The Long Island Rail Road Co. v. The Ahnapee and Western Railway Company.

So ordered.