487 F.2d 179
 AJAYEM LUMBER CORP., Plaintiff-Appellee,
v.
PENN CENTRAL TRANSPORTATION CO. et al.,
Defendants-Appellees, The Long Island Rail Road
Company, Defendant-Appellant.
The LONG ISLAND RAIL ROAD COMPANY, Third-Party Plaintiff-Appellant,
v.
UNITED STATES of America, Third-Party Defendant-Appellant,
and Interstate Commerce Commission, Third-Party
Defendant-Appellee.
PENN CENTRAL TRANSPORTATION CO. et al., Plaintiffs-Appellees,
v.
The LONG ISLAND RAIL ROAD COMPANY, Defendant-Appellant.
 Nos. 843, 848, Dockets 72-2123, 72-2189.
 United States Court of Appeals,
Second Circuit.
 Argued June 4, 1973.
Decided Nov. 7, 1973.
 
 John B. Wyss, Washington, D. C. (Carl D. Lawson, Thomas E. Kauper, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., on the brief), for appellant United States.
 Raymond M. Zimmet, Washington, D. C. (Fritz R. Kahn, Gen. Counsel, I. C. C., Washington, D. C., on the brief), for appellee I. C. C.
 Edward A. Kaier, Philadelphia, Pa. (Jerome H. Shapiro, New York City, Richard J. Murphy, Philadelphia, Pa., Richard B. Wachenfeld, Newark, N. J., Frederick G. Hoffmann, New York City, Andrew C. Armstrong, Baltimore, Md., on the brief), for appellee Railroads.
 Walter J. Myskowski, Washington, D. C. (George M. Onken, Jamaica, Robert R. Prince, New York City, Richard H. Stokes, Jamaica, on the brief), for appellant Long Island Rail Road Co.
 Before HAYS, MANSFIELD and MULLIGAN, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 This is an appeal from a decision and order of the United States District Court for the Eastern District of New York in a case which has had a four year history of litigation and adjudication in the Interstate Commerce Commission and the courts. Although there are innumerable complexities involved in the issue of rate-making for railroad carriers of freight, the sole issue upon which this appeal rests is whether the Long Island Rail Road successfully divorced itself-or "flagged out" in Interstate Commerce Commission parlance-from the action of the Tariff Executive Association-Eastern Railroads ("TEA-ER") when that body filed a master tariff with the ICC proposing 6% increases in the joint freight rates[1] of the Long Island and its other member railroads. The district court, in upholding the position of the appellee railroads and the ICC, determined that the Long Island has been unsuccessful in its attempt to "flag out" of the proposed rate increase when notified of it by the TEA-ER and thus it enjoined the LIRR from refusing to accept freight cars tendered to it and from refusing to apply the newly established formula for division of joint rate revenues-a "self-help" action taken by the LIRR in response to the refusal on the part of the TEA-ER and the ICC to recognize its flag out.
 
 I. Factual Background
 
 2
 The Tariff Executive Association-Eastern Railroads is an association of railroads authorized by section 5a of the Interstate Commerce Act, 49 U.S.C. Sec. 5b, and approved by the Commission. The Long Island and the appellee railroads are members of the TEA-ER and have an agreement authorizing joint actions by the Association. The TEA-ER provides a focal point for joint consideration of rate changes and it acts as a tariff bureau which files and publishes the necessary documents to make a rate change effective. To this end, the Association, as do other similar bodies throughout the nation, holds power of attorney from its members which enables it to make publications and filings on behalf of its members. Because such concerted action in the area of rate-making clearly falls within the proscriptions of the federal anti-trust laws, Congress in authorizing such associations exempted them from the anti-trust laws, but in so doing it provided that any agreement establishing the procedure for the determination of joint rates must afford "each party the free and unrestrained right to take independent action either before or after any determination arrived at through such procedure." 49 U.S.C. Sec. 5b(6).
 
 
 3
 The "flagging out" procedure which is at the center of the controversy at bar is one method by which member railroads can exercise their right of independent action under section 5a of the Act. It enables a member of a rate-making association to divorce itself from a "joint" decision made by such an association (if that decision has the effect of changing established rates) by giving due notice to all concerned parties. After that notice is given, the association, acting as agent for the railroads, notes when it publishes the new tariff schedule, that the new rate will not be applicable to the railroad which has "flagged out."
 
 
 4
 The Interstate Commerce Act provides for two methods for changing existing joint rates. Rates may be changed by a single carrier, by several carriers acting independently of their association, or by all carriers through the action of their association after the consent of all of the affected carriers is received. The new rates are then subject to review by the ICC under 49 U.S.C. Sec. 15(7) where a determination of the reasonableness of the new rates is made. The second method of changing existing joint rates is through the action of the Commission-either at the request of other carriers or on its own motion-under section 15(1) after a full hearing is accorded where the views of an objecting carrier may be presented. When the membership of a rate-making association decides to propose changes in existing rates, a dissenting member by giving due notice, i. e. "flagging out," may continue to charge the previously existing rates. Since proposed rates constitute changes in existing rate schedules, the proposal is subject to ICC examination and possible suspension under section 15(7). Thus in the present case where the Long Island wanted to maintain the status quo its request was not subject to any procedure other than one for "flagging out" or, eventually, if requested by the ICC or a carrier, a section 15(1) full hearing to determine whether the existing rates which it wished to maintain were correct, just and reasonable.
 
 
 5
 To expedite a rate change, the ICC may give railroads special permission to dispense with some of the publication requirements and proceed in what is known as the short-form method. This procedure was followed in the case at bar. The sequence of events surrounding the challenged action is set forth in detail in the district court's opinion, 350 F.Supp. 111, 114-117 (E.D.N.Y.1972), and will not be repeated here.
 
 II. The District Court Decision
 
 6
 The district court concluded that the Long Island was not entitled to claim its local rates because it was bound by the action of its agent, the TEA-ER, in publishing the new rates in its behalf. The court held that the railroad's actions in notifying the Association of its desire not to be included in the new rate schedule were not sufficient to enable the Long Island to maintain its existing rates. The court ruled that a member railroad could opt out of an association decision on rate-making only by revoking the power of attorney that the railroad had given the association. It further decided that such a revocation could only occur in strict accordance with the rules as laid down by the Commission, which would include filing a formal statement of its own proposed revised tariffs for submission to the ICC for approval under 49 U.S.C. Sec. 15(7).
 
 
 7
 The district court rejected the argument of the Long Island, also made by the United States which had confessed error, that the actions of the TEA-ER and the other carriers in forcing the higher joint rates upon the Long Island violated the right of independent action guaranteed to members of associations such as the TEA-ER by section 5a of the Act. The court found that section 5a, the Reed-Bulwinkle Act, did not call for any change in the consequences of the powers of attorney which were in effect at the time of the adoption of section 5a, and that the Long Island could have exercised its right of independent action by revoking the power of attorney it had filed with the Association.
 
 
 8
 We reverse. The Interstate Commerce Commission erred in finding that the Long Island Rail Road failed to take the proper steps to opt out of the increased rates submitted to the Commission by the tariff-publishing agent of the eastern railroads. It is clear that the Long Island took every step possible to "flag out" of the proposed increased rates submitted to the ICC by the Tariff Executive Association. The railroad appellees and the ICC agree that but for their interpretation of the power of attorney issued by the LIRR to the TEA-ER the Long Island could not be held to have acquiesced in the new rate schedule. We think it patent, however, that the powers of attorney between the railroad members of associations such as the TEA-ER and their agent only give the latter the authority to file proposed rate changes and not to set them without consultation or concurrence of the member railroads. Indeed, by letter of October 9, 1969, the chairman of the TEA-ER wrote to the Long Island and stated that the proposed rate schedule was about to be submitted for approval and that he assumed that the Long Island would "join with the other railroads." But, he continued, if "this should be contrary to your desires you may direct me to eliminate the name of your company and the petition will be amended accordingly." Such procedures as the Long Island followed in this case have been considered adequate in the past to enable a member railroad to disassociate itself from association actions.
 
 
 9
 The ICC persists in arguing that member railroads of the TEA-ER can revoke their powers of attorney only on giving 60 days notice of intention to file a formal withdrawal. Not only does it appear that the 60-day notice provision is applicable only when a principal is revoking the total power of attorney held by its agent preparatory to its retaining another agent, but, more importantly, as we have said, the power of attorney did not authorize the TEA-ER to propose or consent to new tariffs or rates; it merely permitted the filing of tariffs consented to by member railroads. A carrier does not waive its right of independent action under section 5a of the Act by giving a power of attorney. The suggestion of the ICC, that the Long Island's remedy was to file a suit in equity to compel the agent to file the flag out can hardly be called the kind of independent action which the Reed-Bulwinkle Act was designed to protect.
 
 
 10
 The ICC also contends that the Long Island's effort to flag out of the new rates was defective because it was not made as a formal motion or similar procedure, the exact nature of which the counsel for the ICC never made clear. The statute does not require any specific form for the "flag out" notice to the Commission and the Long Island's efforts to notify all concerned about its intentions were clearly adequate, especially in view of ICC's lack of precision in what it would require for a "formal" flag notice.
 
 
 11
 If the Long Island's right of independent action was to be given any meaning at all, it was entitled to a hearing before the new joint rates went into effect. Until such a hearing was held and a determination made of the lawfulness of the rates as proposed, the Long Island had a right to insist on the maintenance of its existing joint rates. See ICC v. Columbus & Greenville Ry., 319 U.S. 551, 555, 63 S.Ct. 1209, 87 L.Ed. 1580 (1943).
 
 
 12
 Although we are persuaded that the position taken by the Long Island must prevail we are not so clear as to the consequences which should follow upon our reversal of the district court's decision. The Long Island is entitled to recover from the railroad defendants only such damages as it actually suffered by reason of the defendant's institution of the new higher rates before the hearing and determination of lawfulness to which the Long Island was entitled. If we were to order that the Long Island should collect as damages the difference between what it had to charge as divisions of the joint rate and what its local rates were when the changes were made, the Long Island would receive a windfall without any showing of actual damages. Moreover, the ICC has reached the merits of the reasonableness of the increases involved in this dispute and has found that the increases were lawful in that they did not exceed reasonable maximum levels. 337 ICC 274, 286 (1970). Finally, since there have been several subsequent increases, further ICC rate proceedings in this action would appear to be unjustified.
 
 
 13
 The Long Island, in asking this court to reverse the decision of the district court contends that the effect of the higher rates has been to lower the volume of traffic on its road, causing it loss of revenue. It suggests that it be permitted to negotiate new divisions of the joint rates sufficient for it to retain as damages no more than an amount necessary to cover the full costs of performing the freight service with no return on investment or profit above such full costs. While expressing no views as to the merits of this proposal, we note that it is one of several possible solutions to the question of the proper remedy.
 
 
 14
 A remand is necessary so that the district court may determine the amount of damages, if any, which the Long Island is entitled to receive as a result of our decision determining that the Long Island should have been allowed to flag out of the new joint rates submitted by the TEA-ER and authorized by the ICC.
 
 
 15
 Reversed and remanded.
 
 
 
 [1]
 Joint rates are employed when shipments are transported over the tracks of more than one railroad. The rate paid is divided between the railroads over whose tracks the shipments pass according to a schedule established by agreement of the affected railroads. The share of each railroad in the joint rates is usually lower than the charge for a comparable local shipment, i. e., the charge for shipments which travel over the tracks of only one railroad