AXINN & SONS LUMBER CO., INC.,
et al., Plaintiffs,

v.

The LONG ISLAND RAIL ROAD
COMPANY, Defendant and
Third-Party Plaintiff,

v.

TRAFFIC EXECUTIVE ASSOCIATION–
EASTERN RAILROADS et al.,
Third-Party Defendants.

No. 75–C–280.

United States District Court,
E. D. New York.

Feb. 21, 1978.

On Motion for Summary Judgment
July 12, 1978.

George Carl Pezold, Huntington, N. Y., for plaintiffs; Thomas R. Hirschmann, Augello & Pezold, P. C., Huntington, N. Y., of counsel.

George M. Onken, Richard H. Stokes, Armand J. Prisco, Jamaica, N. Y., Walter J. Myskowski, Washington, D. C., for defendant and third-party plaintiff.

Harry G. Silleck, Jr., Leonard Garment, Douglas M. Parker, John L. Altieri, Jr., Mudge, Rose, Guthrie & Alexander, New

York City, Donovan, Leisure, Newton & Irvine, New York City, for certain third-party defendants; Covington & Burling, Washington, D. C., of counsel.

BARTELS, District Judge.

Motion by third-party defendants to dismiss the amended complaint. A similar motion to dismiss was made by The Long Island Rail Road Company ("LIRR"), which was argued and denied on October 3, 1975. Thereafter the third-party defendants were impleaded by the LIRR and they promptly proceeded to bring this motion to dismiss the complaint.

A history of this litigation may be found in *Ajayem Lumber Corp. v. Penn Central Transportation Co.*, 487 F.2d 179 (2d Cir. 1973), *opinion clarified and affirmed on rehearing,* 496 F.2d 21, *cert. denied,* 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 124 (1974), and also in the two decisions of this court dated October 3, 1975 and January 6, 1976. The action was originally brought by Axinn & Sons Lumber Co., Inc. pursuant to Sections 8 and 9 of the Interstate Commerce Act, 49 U.S.C.A. §§ 8, 9, by and on behalf of various shippers, against The Long Island Rail Road Company to recover alleged freight overcharges. The rates at issue here are increased joint freight rates (Ex Parte Nos. 262, 265, 267 and 281). In *Ajayem, supra,* the Court of Appeals specifically held that the LIRR had properly "flagged out" of certain proposed joint rate increases filed by the Traffic Executive Association-Eastern Railroads ("TEA–ER"), which the court held were unlawfully promulgated in violation of LIRR's right of independent action under 49 U.S.C. § 5b(6).

The third-party defendants (hereafter "defendants") have presented new arguments and additional authorities not heretofore considered, which they claim should change this court's decision. The LIRR, of course, joins in this motion in taking its second bite of the cherry. On the other hand, plaintiffs claim that the decision of October 3, 1975, is the law of the case, (*White v. Higgins,* 116 F.2d 312 (1st Cir. 1940)), and that the legal issue should not be relitigated. It will be unnecessary to pass upon this contention since the court believes that the interest of justice would be best served to consider the additional claim of the defendants.

The fundamental issues raised by the parties are two: (1) were the flag out tariffs illegal as to LIRR *ab initio,* and (2) if so, do the principles of equitable restitution bar plaintiffs from recovery? Defendants on this motion argue that under the authority of *Keogh v. Chicago & Northwestern R. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *Atlantic Coast Line R. Co. v. State of Florida,* 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935), and *Moss v. C.A.B.,* 172 U.S.App.D.C. 198, 521 F.2d 298 (1975), there is no basis for any recovery by the shippers against the railroads. They vigorously contend that *Ajayem* held only that LIRR's contractual right to "flag out" was violated and not that any provision of the ICA was violated; that the tariffs on file under Ex Parte Nos. 262, 265, 267 and 281 were lawfully on file and authorized the change of rates; and that plaintiffs' recovery would interrupt the rate scheme provided by the ICA and would allow a windfall to the plaintiffs. In support of their contentions defendants assert that plaintiffs cannot prove that the prior rates established by the previous tariffs on file in Ex Parte 259 were legal. They point out that the joint increased rates of Ex Parte Nos. 262, 265, 267 and 281 were subsequently held reasonable by the ICC and that consequently they were of necessity lawfully on file at the time filed. Therefore, they claim that the increased rates charged pursuant to the Commission's order were not "overcharges." The real test as to overcharges, according to these defendants, is whether there has been a violation of the provisions of the ICA.

█ The difficulty with the defendants' arguments, it seems to us, is that they ignore completely the fact that the increased rates, as far as LIRR is concerned, were unauthorized and that there is no authority for the proposition that the subsequent finding of reasonableness by the ICC converts an unauthorized tariff retroactive-

ly into an authorized tariff. They seem to ignore completely the predicate upon which *Ajayem* was founded, i. e., it is not the filing of the tariffs *per se* to which the right of independent action attaches but the filing of the tariff without the consent of all the parties to the proposed tariff. *See* § 5b(6) of the ICA. If lack of agreement is properly communicated, the status quo is maintained as far as dissenters are concerned. ICC Rule 52, contained in Tariff Circular No. 20 (49 CFR Chap. X, Subchap. D, § 1300.52), makes it quite clear that all tariffs published by agents on behalf of carriers must be duly authorized. As far as LIRR was concerned, the tariff rates filed under Ex Parte Nos. 262, 265, 267 and 281 were unauthorized and in violation of the ICA.

### LIRR's right of independent action

■■ As pointed out in *Ajayem, supra,* section 5a of the Reed-Bulwinkle Act permitted LIRR to exercise its right of independent action by "flagging out" of the new rates and thereafter entitled it *to* a hearing before the new joint rates went into effect, and until such a hearing was held and a determination made of the lawfulness of the rates, the LIRR had a right to insist on the maintenance of its existing joint rates (487 F.2d at 183). Defendants cite *Keogh v. Chicago & Northwestern R. Co., supra,* for the proposition that, in substance, plaintiffs' claim is not predicated upon a violation of the Interstate Commerce Act but upon a violation of the Anti-Trust Act and upon certain contract claims against the TEA–ER. We reject this contention. Plaintiffs' claim is not comparable to that of plaintiffs in *Keogh,* which was based, as the court stated, upon hypothetical liability under the Anti-Trust Act and a claim for speculative damages. There the rates complained of were found to be legal by the Commission before they became effective. Here, the improper filings of third-party defendants in Ex Parte Nos. 262, 265, 267 and 281 made the increased rates, as far as the LIRR was concerned, a violation of

the ICA and unlawful at the outset. Accordingly, the plaintiffs are not suing under the Anti-Trust Act, nor are they suing TEA–ER for breach of contract, but have confined themselves to their remedy under the ICA; therefore, they do not fall within the parameters of the *Keogh* case.

### Overcharges

The defendants argue that the amounts paid under the increased rates by the plaintiffs are not "overcharges," as that term is defined in section 16(3)(g) of the Interstate Commerce Act, 49 U.S.C. § 16(3)(g). That section states that "the term 'overcharges' as used in this section shall be deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the commission." So the issue presented is: What tariffs are "lawfully on file with the commission"? The defendants admit that a tariff is not "lawfully on file" when it has not been filed and published in accordance with the procedures dictated by 49 U.S.C. § 6. In this case it has not been so filed.

■ Section 6, subsection 6, 49 U.S.C., specifically requires that all rate schedules be filed in compliance with "regulations prescribed by the Commission." The Commission has issued such regulations in 49 CFR Chap. X, Subchap. D, § 1300.52, under "Responsibilities of carriers under tariffs." This section specifically provides: "(b) if one or more carriers are, without proper authority, so shown as participating in any tariff and other carriers are lawfully shown as parties thereto, the use of the publication is unlawful as to the carriers that are named as parties thereto without proper authority and lawful as to those that are parties to it under proper authority." Since the filing of the tariffs in Ex Parte Nos. 262 *et seq.*, naming LIRR, were clearly without the proper authority of LIRR, these filings were "unlawful" under the terms of the regulations (§ 1300.52) and consequently "unlawful" under 49 U.S.C. § 6(6).[1] Concluding, therefore, that the

---

1. It is proper to note that subsection (c) of § 1300.52 of the regulations confirms our earli-

er opinion in *Axinn* of October 3, 1975, in the following statement: "Responsibility and liabil-

complained of increases were unlawful as to LIRR when originally filed, we find that plaintiffs' claim is properly one for statutory "overcharges," and that this case is controlled by *Chicago, M., St. P. & P. R. Co. v. Alouette Peat Products*, 253 F.2d 449 (9th Cir. 1957), as we have heretofore held in *Axinn v. LIRR*, 75–C–280, Memorandum-Decision and Order dated October 3, 1975.

### Equitable Restitution

The main contention of the defendants is that the plaintiffs' claim in this case is in reality not one for overcharges but rather an action for equitable restitution. Such an action they claim is barred under the authority of *Atlantic Coast Line R. Co. v. State of Florida, supra*, and *Moss v. C.A.B., supra*. Since we find these authorities not controlling, a brief analysis is necessary. In *Atlantic* there existed, in Florida, the so-called Cummer rate scale for intrastate transportation of logs, tariffs for which had been approved by the Florida Railroad Commission. The ICC, acting upon a complaint that the rates were unduly discriminatory against interstate commerce, issued an order dated February 8, 1929, granting an increase, for the future, in such rates to a parity with interstate rates. By a mandate filed March 7, 1931, the Supreme Court reversed the ICC's order, holding that it was void for want of supporting findings. Between February 8, 1929 and March 7, 1931, Atlantic made freight collections at the increased rate. Subsequently, by an order effective February 25, 1933, the ICC, after making a new set of findings, prescribed the same increase in rates, which were sustained by the Supreme Court on the ground of sufficiency of the new findings. In the meantime, shippers and others instituted a non-statutory action for restitution of the excess rates paid to Atlantic between February 8, 1929 and March 7, 1931, under the ICC's order dated February 8, 1929.

By a 5 to 4 decision, the Supreme Court held that restitution was a matter of equity and was not owing from the carrier for the whole or any part of the excess rates collected from the shippers under the first order which was void. In brief, the Court reasoned that inequality and injustice were inherent in the Cummer scale rates during the years they were suspended for increased rates and also the years they were in force. Accordingly the Court held that any claim for restitution of excess rates, seeking the benefit of the Cummer scale rates, was not based upon any equitable consideration but upon procedural entanglements resulting in a voidable ICC order. Consequently the Court held that the plaintiff's claim was insufficient to invoke an exercise of the Court's discretion.[2]

We find the factual context of the present case to be quite different from the background in *Atlantic*. In this case there is no claim of discriminatory rates, no claim that the filing of the joint rate increases was merely voidable rather than void, and no claim for equitable restitution based upon unjust enrichment of the LIRR. Indeed, the LIRR never claimed it was equitably entitled to the excess rates which it was forced to collect despite its strenuous and ultimately successful opposition to their imposition. Here the shippers' claim is based upon a statutorily created action for the recovery of "overcharges" in excess of properly filed rates and no equitable grounds exist to defeat it.

ity for the unlawful incorporation of any carrier in a tariff, or for exceeding the authority conferred by a limited concurrence, will rest wholly upon the carrier that issued the tariff."

2. Other grounds for the Court's rationale were: (1) the low intrastate rates were illegitimate, and the Court would not lend its aid in perpetuating a forbidden practice; (2) discrimination against interstate commerce, by confiscatory intrastate rates must be considered in determining the equity of the carrier's possession of the higher rates during the period; (3) the shippers had no equity interest which would override a declared policy and Act of Congress; (4) the ICC's first order was simply voidable due to a defect which was subsequently cured; and (5) restitution is not a right but rests upon the sound discretion of the court, and it will not be ordered unless funds were received under such circumstances that the possessor will give offense to equity if allowed to retain them.

In *Moss, supra,* the non-statutory recovery of unlawful air passenger fares in excess of the last lawfully established rates effectuated by the Civil Aeronautics Board in violation of the Federal Aviation Act, was denied. The primary reason for the denial was that the earnings of the airlines during the period were inadequate and that equity required no restitution where there was no showing that the invalidated rates had in fact exceeded the just and reasonable charges. The distinction between the claim for equitable restitution and the statutory claim for overcharges permitted in *Chicago, M., St. P. & P. R. Co. v. Alouette Peat Products, supra,* was recognized in *Moss, supra,* where the court said:

> *Alouette* is distinguishable as a case in which the full amount of a rate increase was restored, even though at least part of that increase appeared just and reasonable, because increased rates were not properly on file with the Commission. We have not discussed the matter of "overcharges," or charges in excess of properly filed rates. Manifestly, the case for a strict rule of recovery is far stronger in that case. 172 U.S.App.D.C. at 207, 521 F.2d at 307. (Footnotes omitted.)

If this action were to be construed as one for equitable restitution instead of one for overcharges, the plaintiffs would be in a strong position to invoke the principles of equity in their favor.

### Disruption of the ICA rate scheme

Referring to the defendants' claim that the ICA rate scheme will be disrupted if plaintiffs are allowed to recover, we note that the central objective of the Interstate Commerce Act is to promote the establishment of reasonable and non-discriminatory rates for interstate transportation. Under § 15 of 49 U.S.C. the ICC has been afforded the means to insure that such rates are being applied. While we are cognizant of the distinction between proceedings under § 15(1) and § 15(7), we interpret both types of proceedings as aimed toward the central objective of the ICA. In conformity with that objective, the ICC has conducted § 15(7) hearings on each of the increases at issue in this case, and has found them all reasonable.

Third-party defendants in the present application argue that to avoid disruption of the national ICA rate scheme, the ICC's finding of reasonableness must, in effect, be applied retroactively to cure the defect in the original tariff filings, unconsented to by the LIRR. We cannot agree with third-party defendants that insistence upon their compliance with the requirements of 49 U.S.C. §§ 5b(6) and 6(6), and ICC Rule 52 would be disruptive of the ICA rate schedule. We do however recognize, as mandated by the Court of Appeals in *Ajayem, supra,* 487 F.2d at 183, that it would be disruptive of the rate scheme to permit the LIRR to continue to charge its preceding rate after the ICC's determination of the reasonableness of each of the rate increases. Consequently, while each increase was unlawful as to the LIRR at the time of filing, and gives rise to a potential claim for overcharges, that claim is limited to the period prior to the ICC's determination of the reasonableness of the increase in question.

We conclude, therefore, that the defendants' motion to dismiss the amended complaint must be denied and that the plaintiffs' claim must be limited to the intervals between the initial filing of Ex Parte Nos. 262, 265, 267, and 281 and the respective findings of reasonableness made by the ICC on each of these increases.

SO ORDERED.

## ON MOTION FOR SUMMARY JUDGMENT

Plaintiffs move for summary judgment on the liability of the The Long Island Rail Road Company ("LIRR") for overcharges of freight rates. Third-party defendants, from whom the LIRR seeks indemnificatio. or contribution for any recovery by plaintiffs, cross-move for partial summary judgment on the ground that plaintiffs' claims are barred in part by the statute of limitations. This memorandum confirms the court's bench decision of July 6, 1978.

A history of this litigation and the earlier action from which it arises, together with their factual background, may be found in *Ajayem Lumber Corp. v. Penn Central Transportation Co.,* 487 F.2d 179 (2d Cir. 1973), *opinion clarified and affirmed on rehearing,* 496 F.2d 21, *cert. denied,* 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 124 (1974), and in decisions of this court dated October 3, 1975, January 6, 1976, February 21, 1978, and May 12, 1978, and consequently need not be repeated here. Finding that no questions of fact are presented on the issue of the LIRR's liability, and that plaintiffs are entitled to recovery as a matter of law, plaintiffs' motion for summary judgment is granted.

This decision recognizes the important distinction existing between 49 U.S.C. §§ 15(7) and 15(1). The former permits the filing of group tariffs by the railroads which are binding on all who consent thereto if they are subsequently determined by the Interstate Commerce Commission ("ICC") to be within a reasonable maximum and minimum range of rates. They are not binding on those who do not consent to the filing in spite of the subsequent determination of reasonableness by the ICC. This is in contrast to 49 U.S.C. § 15(1) which permits the ICC to prescribe the parameters of reasonable maximum and minimum rates which railroads must charge. These rates are binding on the railroads whether they consent to them or not. Memorandum Decision, May 12, 1978. *Compare Ayrshire Collieries Co. v. United States,* 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1949).

■ The rates collected from plaintiffs by the LIRR under Ex Parte Nos. 262, 265, 267, and 281 were unlawful because not consented to by the LIRR and give rise to a statutory claim for overcharges, cognizable by this court under 49 U.S.C. §§ 8, 9, and 16. Memorandum Decision, October 3, 1975; Memorandum Decision, February 21, 1978. The LIRR used the same procedures to "flag out" of Ex Parte Nos. 265, 267, and 281 as the Court of Appeals held sufficient for a "flag out" of Ex Parte No. 262 in *Ajayem, supra.* This flag out was not waived as to any of these increases, including those in Ex Parte Nos. 265 and 267 which were published by third-party defendants without the LIRR's consent. The LIRR maintained its objection to all of these increases and sought a roll-back of Ex Parte Nos. 262, 265, and 267 (roll-back denied for lack of jurisdiction, Memorandum Decision, January 6, 1976), as it did for Ex Parte No. 281 (roll-back granted, *Long Island Rail Road v. United States,* No. 73 C 310 (E.D.N.Y.1974) (three-judge court)). Consequently, these increased rates remained unlawful as to the LIRR and plaintiffs until the LIRR consented to them in March 1976. Memorandum Decision, May 12, 1978, at 3–6.

■ Although the LIRR was required to charge these increased rates under compulsion of a lower court order (subsequently reversed), that fact does not make them lawful, and certainly does not entitle the LIRR to retain the overcharges collected. Memorandum Decision, October 3, 1975, at 3, 5–6; Memorandum Decision, May 12, 1978, at 6. Nor did these rates become lawful by virtue of the ICC's subsequent finding that the proposed increases in Ex Parte Nos. 262 through 281 were reasonable. The ICC conducted hearings under 49 U.S.C. § 15(7) in which it approved these Ex Parte tariff rates as permissible maximum increases. The ICC did not, however, conduct proceedings under 49 U.S.C. § 15(1) in connection with these increases, and consequently never prescribed increases in the reasonable maximum and minimum rates the railroads could charge. Absent such prescriptive proceedings, the ICC's findings that the increases were reasonable did not make those increases, filed without the LIRR's consent, binding or lawful as to the LIRR. Memorandum Decision, May 12, 1978.

■ There is no question that the LIRR's rates under Ex Parte No. 259, which were not lawfully changed as far as the LIRR was concerned by Ex Parte Nos. 262 through 281 prior to March 1976, remained lawful rates. Third-party defendants contend that there is a factual question as to

whether the LIRR would have, or could have continued to charge its rates under Ex Parte No. 259 even if its flag out of the increase in Ex Parte Nos. 262 through 281 had been fully honored. Based on an affidavit and supporting exhibits submitted by Charles L. Smith, chairman of the defendant Traffic Executive Association-Eastern Railroads, third-party defendants claim that Ex Parte 259 rates, although previously lawful, would have become discriminatory and unduly preferential and retroactively unlawful if charged after the increases in Ex Parte Nos. 262 through 281 had been found reasonable by the ICC. One answer to this argument is that the Court of Appeals never made such a determination of unlawfulness of Ex Parte No. 259 when it validated the LIRR's flag out. Another answer is that such a determination would nullify the effect of 49 U.S.C. § 15(7) as far as flag outs are concerned and, moreover, would require this court to disregard a prior lawful rate predicated upon a hypothesis, and at the same time engage in speculative post-hoc ratemaking, a function which the court has no power to perform. *See Keogh v. Chicago & Northwestern R. Co.,* 260 U.S. 156, 163–164, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *United States v. Kansas City Southern Ry. Co.,* 217 F.2d 763 (8th Cir. 1955); Memorandum Decision, October 3, 1975, at 5. This court cannot cancel lawful rates by such procedures. If this were permissible, disruption and confusion would reign in railroad rate structures. As the last lawful rate in effect before the LIRR's flag out, Ex Parte No. 259 remained the lawful rate until changed in a lawful manner. *Middlewest Motor Freight Bureau v. United States,* 433 F.2d 212, 224 (8th Cir. 1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971); *Chicago, M., St. P. & P. R. Co. v. Alouette Peat Products, Ltd.,* 253 F.2d 449 (9th Cir. 1957). Accordingly, rates collected in excess of those lawful under Ex Parte No. 259 constituted overcharges which plaintiffs are now entitled to recover.

## II

Third-party defendants' cross-motion for partial summary judgment on claims barred by the statute of limitations is granted.

Although we find that plaintiffs are entitled to recovery as a matter of law and fact, we also find that their claims are barred in part by the statute of limitations prescribed for actions for overcharges by 49 U.S.C. §§ 16(3)(c) & 16(3)(e). For purposes of the three-year limitation period imposed by § 16(3)(c), § 16(3)(e) provides that a cause of action shall "be deemed to accrue upon the delivery or tender of delivery [of a shipment of property] . . . and not after."

▆ We believe that this provision does not provide the ordinary statutory time bar against the enforcement of an existing right, but instead creates a right and sets the date of its extinction. Consequently, since the right is extinguished by the running of time, the ordinary tolling provisions applicable to the traditional statute of limitations against enforcement of rights are not applicable here. According to Congressional intent, section 16(3)(c) and (e) must be read literally. *A. J. Phillips v. Grand Trunk Western Ry. Co.,* 236 U.S. 662, 35 S.Ct. 444, 59 L.Ed. 774 (1915); *Baker v. Chamberlain,* 356 F.Supp. 1314 (N.D.Ill. 1973), so that at the end of the three-year period, the right to recover is not merely barred, but extinguished. *Midstate Horticultural Co. v. Pennsylvania R. Co.,* 320 U.S. 356, 363, 64 S.Ct. 128, 88 L.Ed. 96 (1943).

▆ Even were we to consider the limitation period imposed by § 16(3)(c) as comparable to other statutes of limitation, plaintiffs' claims would still be barred in part. When the LIRR flagged out of the first increase, Ex Parte No. 262, and filed its objections with the ICC, plaintiffs were on notice of a potential claim for overcharges. This claim was not at that time barred by a judicial determination by an appellate court that the challenged rates were lawful. *Compare United States v. One 1961 Red Chevrolet Impala Sedan,* 457 F.2d 1353 (5th Cir. 1972), where the statute of limitations was tolled because plaintiff had no prospect of success prior to the Supreme Court's reversal of existing Constitutional interpre-

tation. Accordingly, plaintiffs' recovery of overcharges must be limited to those accruing on deliveries made on or after February 24, 1972.

SO ORDERED.