**PITTSBURGH AND LAKE ERIE RAILROAD COMPANY, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Consolidated Rail Corporation, Intervenor.**

No. 85–1312.

United States Court of Appeals, District of Columbia Circuit.

Argued April 9, 1986.

Decided Aug. 8, 1986.

Fritz R. Kahn, Washington, D.C., with whom Richard R. Wilson and Mark J. Andrews, Washington, D.C., were on brief, for petitioner.

Louis Mackall, I.C.C., with whom Robert S. Burk, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, I.C.C., Catherine G. O'Sullivan and John P. Fonte, Dept. of Justice, Washington, D.C., were on brief, for respondents.

Paul A. Cunningham, with whom Robert M. Jenkins, III, Marc D. Machlin, Washington, D.C., and Constance L. Abrams, Philadelphia, Pa., were on brief, for intervenor, Consol. Rail Corp., Bruce B. Wilson and Richard A. Mehley, Philadelphia, Pa., also entered an appearance for intervenor, Consol. Rail Corp.

Before GINSBURG, BORK and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

The Pittsburgh and Lake Erie Railroad Company ("P & LE") petitions for review of a decision by the Interstate Commerce Commission in which the Commission dismissed a complaint that challenged the cancellation by Consolidated Rail Corporation ("Conrail") of several joint rates. These joint rates had been applicable to through routes on which Conrail and P & LE were participating carriers. Because we conclude that the Commission properly exercised its discretion in refusing to order the reestablishment of the cancelled joint rates, we deny the petition for review.

I.

A.

A through route is an arrangement, express or implied, that provides for the continuous movement of freight over the lines of two or more railroads. There are a variety of methods by which the railroads along a through route may price their services. If they establish a joint rate, shippers pay a specified rate for the shipment over the route and the revenue is divided among the railroads according to an agreed formula. In the absence of a joint rate, shippers pay a "combination rate," which is

simply the sum of the individual rates charged by those railroads on the through route. The individual rates which, when aggregated, produce the combination rate may be either local rates, applicable to any shipment between the relevant points served by the particular carrier, or proportional rates, applicable only to that carrier's portion of a through movement.

A carrier on a through route that is priced by combination rate is free at any time to modify the local or proportional rate it charges for its portion of the through route, subject to whatever independent legal constraints restrict its choice of rates. By contrast, once a joint rate is established, no carrier may modify it without unanimous agreement from the other participating carriers (although under certain circumstances a single carrier may effectively modify the joint rate by publishing a surcharge). An individual rail carrier may, however, unilaterally withdraw from a joint rate by filing a cancellation tariff.

■ A cancellation tariff is subject to suspension and investigation by the Commission. 49 U.S.C. § 10707 (1982). If the Commission decides to suspend or investigate, the burden rests with the carrier to prove that the cancellation is "consistent with the public interest." 49 U.S.C. § 10705(e) (1982). The threshold decision by the Commission whether to suspend or investigate the cancellation is not subject to judicial review. *Southern Ry. v. ICC,* 681 F.2d 29 (D.C.Cir.1982). However, a carrier may at any time request that the Commission prescribe joint rates where none currently exist. In seeking prescription, the requesting carrier bears the burden of proving that joint rates would be in the public interest. 49 U.S.C. § 10705(a) (1982).

### B.

Conrail provides rail service throughout the industrial northeast and midwest. P & LE runs a smaller, more regional railroad, and its routes are for the most part limited to southwestern Pennsylvania and northeastern Ohio. A substantial percentage of P & LE's traffic moves through interline service. Conrail's lines parallel those of P & LE and extend beyond them. Many of Conrail's single-line routes can therefore compete with the through routes established by Conrail and P & LE.

On October 19, 1982, Conrail filed a cancellation tariff withdrawing from several joint rates, some of which applied to through routes on which P & LE participates. Several protestants—shippers and railroads—requested the Commission to suspend the tariff for investigation before it became effective. (P & LE was not among these protestants, although it later sought to intervene in the proceeding.) A division of the Commission voted to suspend the rate and conduct an investigation, but that decision was reversed by the Commission. The determination not to suspend or investigate the cancellation was, as we have noted, unreviewable, and the new rates went into effect shortly after the Commission's decision.

P & LE then filed a complaint with the Interstate Commerce Commission, charging, *inter alia,* that Conrail's mass cancellation constituted an "unreasonable practice" under 49 U.S.C. § 10701(a) (1982), and asking that the Commission "order the reestablishment of through routes and joint rates," except with respect to those routes and rates for which Conrail could justify the cancellation on the basis of superior efficiency. Complaint, Joint Appendix ("J.A.") at 1–3. The unreasonableness of Conrail's action, P & LE contended, lay in the fact that it had indiscriminately cancelled rates for efficient and non-efficient routes. In support of this argument, P & LE submitted an "Efficiency Analysis," comparing Conrail's single-line routes with the through routes at issue. This study examined thirteen sample origin-destination pairs, and concluded with respect to seven of them that neither the single-line route nor the through route was "clearly more efficient," with respect to three of them that the Conrail route was more efficient, and with respect to the other three that the joint P & LE–Conrail route was more effi-

cient. J.A. at 56–86. P & LE argued that this study proved that the mass cancellation was at least partially anti-competitive. Conrail challenged both the method and the conclusions of P & LE's efficiency analysis.

The Administrative Law Judge dismissed the complaint, finding that the through routes remained open despite the joint rate cancellation and that P & LE had not met its burden of proof on the issue of the relative efficiency of the through routes and the single-line routes. P & LE appealed the dismissal to the Commission, which affirmed the ALJ in all significant respects.

The Commission began its decision by noting that the pleadings that P & LE had submitted contended that the rate cancellation was contrary to the public interest as defined in 49 U.S.C. § 10705(e) (1982), but that section 10705(e) by its terms dealt only with the burden the *cancelling carrier* must meet should the Commission decide to suspend or investigate a cancellation tariff. The Commission had already declined to suspend or investigate Conrail's cancellation tariff, and therefore section 10705(e) was not directly applicable. Since P & LE was requesting the reestablishment of joint rates, the Commission construed its appeal as a request for prescription under 49 U.S.C. § 10705(a) (1982).

The Commission concluded that the simultaneous cancellation of joint rates was not an unreasonable practice. It then proceeded to examine whether P & LE had met its burden of proving that a prescription of joint rates was in the public interest. First, the Commission determined that the single-line routes appeared to be more efficient than the through routes, and therefore that the through routes did not merit regulatory protection. It found P & LE's efficiency analysis methodologically unsound, and disputed P & LE's principal legal premise—that it needed to prove only that the through routes were not signifi-

cantly less efficient than the single-line routes, rather than that they were necessarily more efficient. Second, the Commission explained that even if the through routes were more efficient, a joint rate prescription would not be necessary if the routes remained open, which they did. Finally, the Commission suggested that even if the through routes *had* been more efficient and *were* now closed—allegations it found to be unsupported—prescription might still not be in the public interest absent a showing that the routes could not be made competitive through other means, and noted that P & LE had rejected offers from Conrail to negotiate new rates. *Pittsburgh & Lake Erie R.R. v. Consolidated Rail Corp.*, No. 39176 (Sub-No. 1) (Apr. 3, 1985) ("Commission Decision"), J.A. at 299–312.[1] Accordingly, P & LE's complaint was dismissed.

## II.

P & LE challenges the Commission Decision on several grounds. It claims that the Commission improperly dismissed its unreasonable practice claim, that the Commission wrongly construed its complaint as a request for prescription of joint rates, that even assuming the validity of that construction, the Commission's analysis of whether prescription was in the public interest was inadequate, and that it was unfairly prejudiced by several procedural rulings made by the ALJ. We discuss each in turn.

## A.

The Commission properly concluded that there is nothing inherently unreasonable in simultaneous cancellation of a number of joint rates. No law requires carriers to cancel rates one at a time. P & LE contends, however, that what it objects to is not the fact that numerous rates were

---

1. Additionally, the Commission explained that if there was strong motor carrier competition, that might help keep the rates competitive by providing shippers an alternative to rail service, and noted that no shippers had joined P & LE's complaint, suggesting that none had been harmed by the cancellation. Since the Commission seeks to protect competition and not particular competitors, the absence of complaining shippers was considered "highly significant." Commission Decision at 13, J.A. at 311.

cancelled at the same time, but that they were cancelled "indiscriminately." "Indiscriminate" cancellation, however, as P & LE uses the term, is not inherently unreasonable either, because carriers are not required to justify the rates they file unless the Commission investigates those rates.

■ P & LE, as complainant in this proceeding, bore the burden of proof, and its charge that the cancellation was "indiscriminate" is simply an effort to shift that burden to Conrail. This is evident from the manner in which P & LE constructed its case below. The evidence upon which it primarily relied was an examination of thirteen *sample* movements. The purpose of that study was not only to support the reestablishment of joint rates in the three through routes allegedly more efficient than their competing single-line routes, but to demonstrate that the entire mass cancellation was indiscriminate and to use that demonstration as a predicate for the relief requested: an order requiring "the reestablishment of through routes and joint rates, except in those instances where the aforesaid cancellations can be justified as the elimination of inefficient and circuitous movements." Complaint at 3, J.A. at 4.

■ Had the Commission chosen to investigate the mass cancellation before it became effective, Conrail would have borne the burden that P & LE seeks to impose upon it now. The Commission did not so decide, and its determination not to investigate is unreviewable. The claim that Conrail's "indiscriminate" mass cancellation was an unreasonable practice is merely a collateral attack on that final and unreviewable determination and must fail for that reason.

Petitioner's heavy reliance on *Chesapeake & Ohio Ry. v. United States*, 704 F.2d 373 (7th Cir.1983), is misplaced and strengthens our view that it misperceives the nature of its burden. In *Chesapeake & Ohio*, a panel of the United States Court of Appeals for the Seventh Circuit vacated a Commission decision that had approved a mass cancellation of joint rates. The court concluded that the cancelling carrier—

again, Conrail—had failed to meet its burden of proof. Conrail had submitted a study which justified the efficiency of the mass cancellation only in the aggregate and did not indicate whether each of the individual cancellations could themselves be justified as efficient. The Commission decision in that case followed an investigation ordered by the Commission under section 10705(e), and Conrail bore the burden of justifying its cancellation as consistent with the public interest. Conrail did not have a burden to bear in the proceeding before us, and the fact that its aggregate study was insufficient in the *Chesapeake & Ohio* proceeding in no way implies that P & LE can require it to bear a similar burden here simply by charging, or even by proving, that Conrail's cancellations were "indiscriminate."

### B.

■ After rejecting P & LE's unreasonable practice claim, the Commission proceeded to treat its pleadings as a request for prescription of joint rates under 49 U.S.C. § 10705(a) (1982). While P & LE resists this construction of its complaint, it was unavoidable. The old joint rates were no longer in effect; P & LE sought to have them reestablished; therefore, it was seeking prescription of joint rates, and section 10705(a) was the applicable statutory provision.

P & LE contends that construing its complaint as a request for prescription foredoomed the claim, because no carrier in its position can possibly prove a case under section 10705(a). P & LE argues that any carrier that tried would be trapped in a whimsical regulatory paradox: (1) the Commission has historically required carriers requesting prescription to demonstrate that existing rates are unreasonable; (2) since the passage of the Staggers Act, a finding of unreasonableness may only be made where the carrier whose rates are challenged is shown to have market dominance, *see* 49 U.S.C. § 10709 (1982); (3) to prove market dominance, a complainant must demonstrate an absence of effective compe-

tition; but (4) any such demonstration would make it impossible for a carrier in P & LE's situation to argue that the through routes were competitive.

There are several deficiencies in this chain of reasoning. We need identify only one. The Commission did not require P & LE to prove that the existing rates were unreasonable or that Conrail had market dominance, nor does section 10705(a), which governs requests for prescription, make any mention of either showing as a requirement. P & LE's complaint was not dismissed on these grounds. The question whether a rate attacked by a shipper is unreasonable under 49 U.S.C. § 10701a(b)(1) (1982) is distinct from the question whether compelling two carriers to establish a joint rate is in the public interest.

P & LE thus complains that it has been prejudiced by a test that was never applied to it. The apparent basis of its claim that unreasonable rates and therefore market dominance are prerequisites to prescription is a line of cited cases, the most recent from 1959, in which joint rates were ordered on the basis of a finding that existing rates were unreasonable. *See, e.g., Atlantic Coast Line R.R. v. Southern Ry.*, 308 I.C.C. 703, 710 (1959), *modified on other grounds*, 321 I.C.C. 314 (1963); *Montana Western Ry. v. Apache Ry.*, 305 I.C.C. 775, 793 (1959). These cases date from a regulatory era during which the Commission sought rate equalization and routinely found rates unreasonable simply on the ground that they were higher than competing joint rates. The Commission has abandoned that policy, in accordance with the deregulatory mandate of the Staggers Act. Therefore, even if we were to read these old cases as then establishing a requirement that carriers seeking prescription prove that existing rates are unreasonable, the Commission has not imported that requirement wholesale into modern cases, because the statutory definition of reasonableness and the Commission standards for prescription have been substantially changed.

Petitioner's one citation to a contemporary proceeding in support of its argument is Ex parte No. 445, *Standards for Intramodal Rail Competition* (served July 7, 1983), in which the Commission said:

> However, if market dominance existed, we would have reasonableness jurisdiction over the rate level as well as § 10705 authority to prescribe joint rates.

*Id.* at 8. This passage does not support petitioner's claim. It indicates that market dominance is a prerequisite for a finding of unreasonableness, not for prescription of joint rates. Prescription of joint rates is stated as a power additional to the power that arises from a finding of market dominance. The sentence excerpted was part of the Commission's summary of one of its earlier decisions, *Traffic Protective Conditions*, 366 I.C.C. 112, 128 (1982), a reading of which makes evident the error of petitioner's interpretation:

> If anticompetitive abuses occur in the absence of the DT & I Conditions, we could exercise our authority to establish through routes and joint rates under section 10705(a)(1). Further, if a carrier believes that its competitor is canceling joint routes to shut off its traffic and drive it out of business, it could seek relief under section 2 of the Sherman Act, which provides stern penalties for monopolizing or attempting to monopolize any part of trade or commerce.

> Finally, shippers should not be concerned that carriers will use their new freedom to cancel joint routes as a means of obtaining a monopoly position which they can exploit later by raising rates. First, as previously noted, there is usually ample competition from other modes to prevent unreasonably high rates. Second, if there is market dominance by a rail carrier, the Commission has jurisdiction to determine the maximum reasonable level of rates charged by that carrier. Section 10709.

Since the Commission neither applied a market dominance test to P & LE nor was obligated to do so, petitioner's claim that it

is subject to an inescapably contradictory burden of proof is baseless.

## C.

P & LE next argues that, even assuming the validity of treating its complaint as a request for prescription, the Commission conducted its analysis under the wrong standards. Section 10705(e) describes the standard the Commission must employ when investigating a cancellation tariff it has suspended. In such proceedings, the carrier must prove that its cancellation is "consistent with the public interest," and the Commission must, "to the extent applicable,"

> (1) compare the distance traveled and the average transportation time and expense required using (A) the through route, and (B) alternative routes, between the places served by the through route;

> (2) consider any reduction in energy consumption that may result from cancellation; and

> (3) consider the overall impact of cancellation on the shippers and carriers that are affected by it.

49 U.S.C. § 10705(e) (1982). Section 10705(a) describes the standard the Commission applies when deciding whether to prescribe joint rates. That provision, without elaboration, simply states that the Commission shall prescribe joint rates "when it considers it desirable in the public interest." 49 U.S.C. § 10705(a)(1) (1982).

As we explained, P & LE had erroneously asserted in its complaint that Conrail's cancellation tariff violated section 10705(e). Complaint at 2, J.A. at 3. The Commission correctly noted that section 10705(e) applies only when the Commission orders a suspension, which it had not done in this case. The Commission therefore chose to treat this portion of the complaint as a request under section 10705(a) rather then dismissing it outright. In describing the public interest analysis it would conduct under section 10705(a), the Commission stated that it would be "guided" by the criteria of section 10705(e), "since they represent a recent, specific Congressional articulation of the public interest in this context." Commission Decision at 2, J.A. at 300.

Although P & LE originally sought in its complaint to have the tariff declared illegal under section 10705(e), it now argues that the Commission improperly narrowed the scope of its inquiry by drawing upon section 10705(e) in defining the public interest standard of section 10705(a). The provisions of section 10705(e), however, are not narrow ones— requiring, as they do, consideration of "the overall impact of cancellation on the shippers and carriers that are affected," 49 U.S.C. § 10705(e)(3)—and their application in this case was certainly a reasonable exercise of the Commission's discretion to determine the meaning of the term "public interest" in section 10705(a). P & LE's only argument to the contrary consists in citing prior Commission proceedings under section 10705(a) in which the Commission conducted an even broader inquiry, considering factors such as provision of employment or supply of scarce resources, as if the Commission were obliged in every section 10705(a) proceeding to conduct as broad an inquiry as the broadest in its history. No such obligation exists. Nor can we take seriously P & LE's suggestion that by declining to amend section 10705(a), Congress was codifying such an obligation into law through legislative acquiescence. No evidence of any such intent has been adduced. To the contrary, the Commission's analysis was fully consistent with the Rail Transportation Policy adopted by Congress in 1980. That statute requires the Commission "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates" and "to minimize the need for Federal regulatory control over the rail transportation system." 49 U.S.C. § 10101a(1) and (2) (1982). We have little difficulty concluding that the Commission's interpretation in this proceeding of a statute it is charged with administering is a reasonable one, and that is all that is required. *Chevron, U.S.A. Inc. v. Natural Resources De-*

*fense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Commission's framework for defining the "public interest" was sufficiently broad to implement its statutory mandate.

The Commission conducted an adequate analysis of whether prescription would be in the public interest. First, it noted that Conrail's single-line routes appeared to be more efficient than the through routes for which P & LE was seeking joint rates. The Commission declined to accept the conclusions to the contrary derived in the study submitted by P & LE. In that study, P & LE had treated indirect movements as necessarily less efficient than direct movements. The Commission found that more circuitous routes could sometimes be more efficient when traffic is aggregated (*i.e.,* when cars are pooled in order to take advantage of lower overall costs), and therefore rejected P & LE's methodology on the ground that it had been based upon a false premise.

The Commission went on to explain that even if the through routes were more efficient, prescription would not be desirable if the through routes remained open. The Commission concluded that P & LE had not shown that the routes were closed. The Commission then stated that even if the rates were not currently competitive, prescription would be premature absent a showing that the through routes could not be made competitive through other means. ▇▇▇ This analysis and discussion were sufficient. The Commission concluded that regulatory intervention was not justified when the through routes were less efficient than the others, when the through routes remained open in any event, or when other actions less drastic than imposition of joint rates could be taken by P & LE to make the routes more competitive than they were. P & LE had not met its burden of proof on any of these three issues.[2]

P & LE challenges the Commission's analysis of the absence of need for prescription on a variety of insubstantial grounds, only one of which we will address here. The Commission framed a "threshold question" as "whether the through routes are *more* efficient than the single-line routes and thus deserve regulatory protection." Commission Decision at 7, J.A. at 305 (emphasis in original). Petitioner argues that routes deserve protection as long as they are of equal efficiency to, or perhaps even if they are only slightly less efficient than, their competition, and urges us to set aside the Commission Decision because it applied the wrong standard.

▇▇▇ Since the Commission in fact rejected P & LE's study and concluded that the through routes appeared to be less efficient, application of the standard put forward by petitioner would not have changed the result. In any event, we believe that the Commission was again acting well within its discretion when it defined the public interest standard of section 10705(a) as requiring regulatory protection only when necessary to preserve routes that are more efficient than those that would remain. P & LE has not presented us with any persuasive argument to explain why declining to prescribe joint rates for routes with only "practical parity in efficiency," Efficiency Analysis at 19, J.A. at 74, constitutes an abuse of the Commission's discretion. P & LE relies primarily upon the authority of *Restructured Rates on Grain and Grain Products,* 365 I.C.C.

---

**2.** P & LE's failure to provide sufficient evidence to support prescription of joint rates may in part be attributable to the fact that it did not believe it needed to make out a case for prescription, but could rest and win on its "unreasonable practice" claim. P & LE briefly suggests that by "shift[ing] the focus" of the proceeding, the Commission denied P & LE due process by requiring it to meet an evidentiary standard for which it was unprepared. Brief for Petitioner at 46–47. The Commission's alternative, however, would have been to dismiss summarily that portion of the complaint that requested the equivalent of joint-rate prescription, on the ground that it had been filed under the wrong provision. Such action would have been thoroughly permissible. The Commission's willingness to read the complaint as though it were filed under the appropriate provision can therefore by no stretch of the imagination be characterized as a denial of due process.

635 (1982), a proceeding under section 10705(e) in which the Commission stated in its decision:

> Ultimately, the issues are: (1) whether the proponent has caused other available routes, which had been and otherwise would be logical competitive alternatives, to lose their natural competitiveness; and (2) the effects of this on those involved and the public in general.

365 I.C.C. at 639. P & LE believes the use of the phrase "logical competitive alternatives" implies that any through route of roughly equal efficiency to its competition merits prescription of a joint rate. While the equation of the concept of "equal efficiency" with that of "logical competitive alternative" is not an implausible one, it is not a necessary one, and nowhere in *Restructured Rates on Grain* did the Commission define "logical competitive alternative" as P & LE does, or indicate that joint rates would be prescribed whenever cancellation tariffs were filed with respect to joint rates on through routes of equal efficiency to competing single-line routes. Far more specific is another Commission precedent, *Joint Line Cancellation on Soda Ash by Union Pacific R.R.*, 365 I.C.C. 951, 967 (1982), in which the Commission stated:

> The analysis required by 49 U.S.C. 10705(e)(1) and (2) is designed to determine whether canceled routings are more efficient than those that are retained.

■ We conclude, therefore, that the standard used by the Commission—that P & LE prove that the cancelled rates were for routes that were more efficient than their competition—was neither an unreasonable exercise of discretion nor a departure from precedent and was properly applied in this proceeding.

### D.

Finally, petitioner raises objections to three procedural rulings made by the ALJ.

■ First, petitioner objects to the denial of its motion for leave to file briefs before the ALJ. Complainants have a statutory right to file such briefs. 49 U.S.C. § 10327(d) (1982). In this case, however, the ALJ on November 1, 1983, established a schedule for submissions by the parties which did not provide for briefs. P & LE did not object at that time, and only moved for leave to file briefs on April 23, 1984— one day before the statutory deadline for the ALJ's decision. Under these circumstances, we believe P & LE waived its opportunity to file briefs before the ALJ. In any event, P & LE had the opportunity to submit ample written testimony to the ALJ, and was able to fully brief the case when the Commission conducted its *de novo* review of the ALJ's decision.

■ Second, petitioner claims that the ALJ committed prejudicial error when it denied P & LE the opportunity for oral hearings on two disputed issues. P & LE's original request for oral hearings did not specify the issues involved or the witnesses that would be called. On appeal, P & LE has identified two disputed issues on which it believes it was entitled to oral hearings. The first issue—whether P & LE's efficiency analysis proved that some of the through routes were substantially as efficient as the single-line routes—was irrelevant, since proving that the through routes were substantially as efficient, rather than more efficient, would not have changed the result. The second issue—whether P & LE had had the opportunity to negotiate new pricing arrangements with Conrail—was tangential to the Commission's conclusion. Although the Commission stated that P & LE had rejected Conrail's offer of negotiation, its conclusion that prescription was not in the public interest rested on the adequate and independent grounds that the through routes were not more efficient and that they remained open. Therefore, P & LE was not prejudiced by the ALJ's refusal to hold oral hearings on this issue.

■ Third, P & LE objects to the decision to strike certain evidence it submitted in rebuttal. That evidence consisted of a completely new efficiency study, one which employed a completely different method of analysis. It was properly stricken. It did not in any way rebut Conrail's challenges to the first study. P & LE asserts that the

new evidence was "corroborative" of the conclusions it stated earlier. In that sense, of course, any evidence that is material is "corroborative." That does not entitle one party to introduce it at a stage in the proceeding at which the opposing party will not have an opportunity to respond. Petitioner's claim of prejudicial error is again without merit.

### III.

While P & LE has presented multiple objections to the Commission Decision under review, we do not find in these objections any convincing grounds for setting that decision aside. Accordingly, the petition for review is

*Denied.*