The SOCIETY OF PLASTICS INDUSTRY, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and the United States of America, Respondents,

Forty Railroads, Intervenors.

No. 90–1600.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1991.

Decided Feb. 7, 1992.

---

Martin W. Bercovici, with whom Kris Anne Monteith, was on the brief, for petitioner.

Louis Mackall, V, Atty., I.C.C. with whom, James F. Rill, Asst. Atty. Gen., John J. Powers, III, and John P. Fonte, Attys., Dept. of Justice and Robert S. Burk, Gen. Counsel and Craig M. Keats, Associate Gen. Counsel, I.C.C. were on the brief, for respondents.

Robert M. Jenkins, III, with whom Robert E. Weicher for The Atchison, Topeka & Santa Fe Ry. Co., William P. Quinn for Bay Colony Railroad Corp., Michael E. Roper for Burlington Northern Railroad Co., Charles C. Rettberg for CSX Transp., Inc., Constance L. Abrams for Consolidated Rail Corp., John H. Doeringer for Illinois Central Railroad Co., Robert L. Calhoun for Indiana and Ohio Railway Co., Robert B. Batchelder for Missouri Pacific Railroad Co., Nathan Fenno for New York Susquehanna and Western Railway Corp., Rahway Valley Railroad Co., and The Staten Island Railway Corp., James L. Howe, III for Norfolk Southern Railway Co., and Norfolk and Western Railway Co., and John MacDonald Smith for Southern Pacific Transp. Co., St. Louis Southwestern Railroad Co. were on the joint brief, for intervenors. Paul A. Cunningham also entered an appearance for intervenors.

Before RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and VAN GRAAFEILAND,* Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge VAN GRAAFEILAND.

VAN GRAAFEILAND, Senior Circuit Judge:

The Society of the Plastics Industry, Inc. ("the Society"), a national trade association whose members ship large quantities of goods by rail, petitions this court to review and set aside the Interstate Commerce Commission's decision in *The Society of The Plastics Industry, Inc. v. Consolidated Rail Corp., et al.*, No. 40298 (served Oct. 22, 1990), which held that a Multiple Independent Factor Through Rate ("MIFTR") is a joint rate within the meaning of the Interstate Commerce Act. Consolidated Rail Corporation ("Conrail") and thirty-nine other rail carriers participating in the MIFTRs at issue were permitted to intervene in support of the decision. We affirm.

Rail carriers are authorized to establish through routes and rates applicable to through routes. 49 U.S.C. § 10703(a)(1). "A through route is an arrangement under which a shipment is transported to its ultimate destination by two or more railroads in succession." *Baltimore Gas & Elec. Co. v. United States*, 817 F.2d 108, 110 (D.C.Cir.1987). Historically, the rates used for through routes have been either joint rates or combination rates. A traditional joint rate is a unitary rate arrived at by agreement between the carriers participating in a through route, each carrier's share,

---

* Of the United States Court of Appeals for the Second Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

or "division", being expressed as a percentage of the joint rate. The joint rate must be published and filed with the Commission in a tariff, but the divisions need not be. *See* 49 U.S.C. § 10762(a); *Metropolitan Edison Co. v. Conrail,* 5 I.C.C.2d 385 (1989). A carrier participating in a traditional joint rate may not adjust its division without the specific concurrence of the other participants. *Pittsburgh & Lake Erie R.R. Co. v. ICC,* 796 F.2d 1534, 1537 (D.C.Cir.1986).

A combination rate, on the other hand, is simply the sum of the rates set by all the participating carriers for the movement over their lines. A rate set by an individual carrier may be a local rate, *i.e.,* the rate between the two points served by that carrier, or a proportional rate based on the carrier's portion of a through movement. Such local and proportional rates are published and filed with the Commission in a tariff. An individual carrier may adjust its local or proportional rate unilaterally. *Id.*

An MIFTR is a unitary rate comprised of independent factors representing the amount each participating carrier charges for movement over its line. However, unlike traditional joint rate participants, MIFTR carriers are authorized by previously executed general concurrences to unilaterally adjust their independent factors. An MIFTR is published and filed with the Commission, but the independent factors are not. There are, of course, certain safeguards against injudicious unilateral adjustments by an MIFTR carrier. If a participating carrier is dissatisfied with the change, it may withdraw from the MIFTR. Moreover, any change in the overall rate charged to a shipper under the MIFTR necessitates refiling of the tariff, thus permitting a challenge by the shipper and a complaint about abuses.

In 1987 Conrail announced its intention to cancel its participation in joint rates for the movement of plastics from Southwestern origins to Central–Eastern destinations and in most instances to substitute proportional rates at levels equal to its divisions of the cancelled joint rates. Various shipping interests, including the Society, and various rail carriers petitioned the Commission to suspend and investigate Conrail's joint rate cancellations. The Commission, in *Cancellation of Joint Rates and Routes on Synthetic Plastics, Conrail,* No. 71380 (served Oct. 9, 1987), declined to do so. Conrail subsequently obtained the concurrences necessary for MIFTRs, and published and filed ICC Tariff CR 4026 containing MIFTRs for its through routes.

The Society filed a complaint with the Commission, pursuant to 49 U.S.C. § 11701, challenging Conrail's and its connecting carriers' use of MIFTRs. The Society contended that, because the possibility of unilateral adjustment makes MIFTRs more like combination rates than joint rates, Conrail and its connecting carriers violate 49 U.S.C. §§ 10761 and 10762 by refusing to publish and file with the Commission their independent factors. The Society contended that failure to divulge an MIFTR's independent factors has numerous adverse effects on shippers, carriers, and competition. It alleged that the use of MIFTRs forecloses shippers from negotiating with carriers that refuse to disclose their rates, allows unilateral manipulation of rates by the carrier that is the publishing agent, and permits a dominant carrier such as Conrail, through the use of unilateral adjustments, to skew competition and damage efficiency. In addition, the Society asserted that because the reasonableness of a carrier's joint rate division cannot be challenged, treating an MIFTR as a joint rate violates the Act. In their petition supporting the Society's complaint, IMC Fertilizer Group, Inc., Growmark, Inc., and Farmland Industries, Inc., which have not petitioned for court review, asserted that these adverse effects make MIFTRs an unreasonable practice related to transportation or service in violation of 49 U.S.C. § 10701(a). They said that carriers should "not be permitted to use MIFTRs as a means to unjustifiably shield unreasonable rate increases on market dominant traffic from appropriate regulatory scrutiny." Soo Line Railroad Company, which participates in MIFTRs under ICC Tariff CR 4026, filed a statement asserting that Conrail's ability to manipulate its independent

factor to favor particular gateways makes MIFTRs anti-competitive. Soo likewise has not petitioned for review by this court.

The Society's final argument was that Conrail's communications to the carriers participating in the MIFTRs at issue do not satisfy the provisions of 49 U.S.C. § 10706(a) which exempt certain rate arrangements and communications from the antitrust laws. As the MIFTRs' publishing agent, Conrail gives advance notice to its connecting carriers of adjustments to its independent factor, and invites the connecting carriers to make their own adjustments at the same time, purportedly for economy of publication. The Society asserted that because Conrail does not have rate bureau status, Conrail's communications do not qualify for the exemptions contained in § 10706(a)(2)(A). Moreover, said the Society, even if Conrail did have rate bureau status, its communications are not covered by the antitrust exemption because they are discussions of single line rates under § 10706(a)(3)(A)(i).

The Commission, holding that an MIFTR is a joint rate, denied the Society's complaint. Acknowledging that a joint rate can only be created and adjusted through agreement of the participating carriers, the Commission found the general concurrences used to establish MIFTRs sufficient. It reasoned that

[t]he difference between a traditional joint rate and a MIFTR is in the mechanism for making adjustments after the rate has been established. A traditional joint rate requires a separate arrangement or agreement to make each adjustment. A MIFTR embodies a general arrangement or agreement to accept any such adjustment that any other carrier participant may propose. Both a traditional joint rate and a MIFTR require agreement among all participants in the rate. The fact that the participants in a MIFTR concur at the outset in the right of any party to take independent action with respect to its portion of the rate, rather than entering into specific rate agreements following that initial agreement, does not change the fact that a MIFTR is a joint rate. It is a unitary rate that is jointly held out over the lines of two or more carriers and is established by arrangement or agreement between the carriers.

Having held that an MIFTR is a joint rate, the Commission concluded that an independent factor is, in effect, a division of the joint rate:

The independent factors of a MIFTR, like the divisions of a traditional joint rate, have no existence separate from the MIFTR of which they form a part.... The part of the through service to which any such factor applies is not available for independent purchase by the shipping public. Like any division of a traditional joint rate, a MIFTR factor represents nothing more than a participating carrier's share of a single through charge.

Consequently, the carriers' refusal to publish and file their independent factors was not a violation of the Act's filing requirements.

The Commission also rejected the contention that MIFTRs are an unreasonable practice in violation of § 10701(a). It found no merit in the contention that MIFTRs are unlawful because they shield the independent factors from scrutiny. This, it said, amounted to no more than an argument that "because ... certain advantages [are conferred] upon joint rates, the Commission should look with disfavor upon such rates." It disposed of the Society's assertion that nondisclosure of independent factors precludes shippers from negotiating with carriers, pointing out that the Commission's policy of not compelling disclosure of traditional joint rate divisions had not precluded such negotiations. In response to Soo's assertion that MIFTRs are anti-competitive in that they allow Conrail or any other carrier to manipulate its independent factor to favor particular gateways, the Commission found that MIFTRs enhance competition.

We believe that MIFTRs advance intramodal competition by enabling participating railroads to adjust their independent factors in order to promote the most advantageous routes. As economic conditions change, rates may be moved more

quickly toward efficient levels, and freight may be shifted more quickly onto efficient routings.

The Commission pointed out that Conrail could favor gateways through the manipulation of its prior proportional rates. Moreover, if Conrail manipulated its independent factor in an unlawful manner, Soo was free to file a specific complaint concerning the matter. *See* 49 U.S.C. § 10701(a), (c).

Finally, the Commission rejected the Society's arguments concerning the antitrust exemption provisions in 49 U.S.C. § 10706, stating that "Conrail makes no claim to any such immunity, and it is well settled that rate discussions among joint rate partners do not require immunity and do not necessarily violate the antitrust laws."

■ Our review of the Commission's interpretation of the Act is governed by *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Consolidated Rail Corp. v. United States*, 896 F.2d 574, 578 (D.C.Cir.1990). Under *Chevron*, we ask first "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. at 2781. If Congress has expressed a clear intent on the precise question, that intent controls, and our inquiry is over. *Id.* at 842–43 & n. 9, 104 S.Ct. at 2781 & n. 9. If, however, Congress was "silent or ambiguous with respect to the specific issue," *id.* at 843, 104 S.Ct. at 2782, deference is due the Commission's interpretation, and we ask only "whether the agency's answer is based on a permissible construction of the statute." *Id.*

■ Our initial inquiry under *Chevron* is strictly confined, in that the Supreme Court intended that the term "precise question at issue" be interpreted tightly. *See Central States Motor Freight Bureau, Inc. v. ICC*, 924 F.2d 1099, 1104–05 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 87, 116 L.Ed.2d 59 (1991); *Ohio v. United States Dept. of the Interior*, 880 F.2d 432, 442–43 (D.C.Cir.1989). The precise question before us is whether an MIFTR is an allowable form of joint rate.

■ The Society argues that the language and structure of the Act demonstrate a clear Congressional intent that the traditional form of joint rate be its exclusive form. Describing the Act as "plain and unambiguous," the Society contends that it does not permit adjustment of a joint rate without the concurrence of each participating carrier in the specific adjustment. However, the Act does not define "joint rate", and it imposes few express requirements on the form of a joint rate. Although 49 U.S.C. § 10762(b)(2) contains a concurrence requirement, it does not describe the concurrence that is required. The section provides that "[t]he Commission may prescribe or approve what constitutes a concurrence or acceptance," but it does not specify whether this express delegation of authority is limited to matters of form as opposed to substance, an ambiguity that in itself militates against finding the clarity required by *Chevron*.

The Society also contends that repeated references in the Act to "divisions" of joint rates and resolution of divisions disputes demonstrate a clear congressional intent to deal with only the traditional form of joint rate. The Society asserts that the Act speaks of rates, joint rates and divisions of joint rates but says nothing of MIFTRs, varieties of joint rates or independent factors. It is undoubtedly true that Congress had traditional joint rates in mind when it enacted the relevant statutory provisions. Given that the traditional form of joint rate was the only one in which carriers had participated, what else could Congress have been addressing? However, we cannot accord this fact the weight that the Society would have us give to it. That Congress conceived of joint rates in their traditional form simply does not, without more, amount to an unambiguous expression that they could exist only in that form. Indeed, the broad language of § 10701a, which permits the establishment of "any rate" that is reasonable and not otherwise prohibited by the Act, is some indication of an intent to the contrary.

Contrary to the Society's contentions, a holding that MIFTRs are a permissible

form of joint rate does not render 49 U.S.C. §§ 10705 and 10705a superfluous and meaningless. Section 10705 authorizes the Commission to prescribe divisions of joint rates and permit the cancellation of joint rates, and sets forth certain standards and tests to be applied in these procedures. Section 10705a, added by the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895, allowed joint rate participants to apply a surcharge without the concurrence of the other carriers. § 10705a(a)(1)(A). This authorization was limited, however, in that, under certain circumstances, the surcharge could be cancelled by a participating carrier or a shipper. The authorization was further limited in that it was to expire three years after the effective date of the Staggers Act, subject to extension for one additional year by the Commission. § 10705a(p)(1). Section 10705a contained separate provisions for unilateral surcharges on light density lines, § 10705a(b), and for cancellation of joint rates by carriers recouping less than 110 percent of their variable costs, § 10705a(a), which have not expired. Because traditional joint rates continue to exist, § 10705a's cancellation provisions and § 10705's provisions concerning divisions disputes and cancellations have a continuing role to play. Indeed, before Conrail could enter into the MIFTRs at issue here, it had to comply with § 10705's cancellation provisions. The argument that § 10705a's unilateral surcharge provisions were meaningless if an MIFTR is permissible overlooks the fact that an MIFTR does not provide relief to carriers stuck in traditional joint rates. An MIFTR allows a carrier to make unilateral adjustments only when all of the participating carriers have expressed a general agreement in advance.

■ A somewhat more tenable contention is that Congress, in granting a limited ability to impose unilateral surcharges under § 10705a, intended to foreclose the broad ability to make unilateral adjustments that exists under an MIFTR. The Society relies on the principle of *expressio unius est exclusio alterius*. Upon careful consideration, however, this contention also must be dismissed. Section 10705a was limited not only in the relief it afforded,

but also in the situation it addressed. It was directed to the urgent problem then existing of carriers mired in traditional joint rates that returned less than their variable costs. *See* H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 111 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4110, 4143. Section 10705a's narrow focus was on how to afford immediate relief to those carriers. The Chairman of the House Interstate and Foreign Commerce Committee explained that

> [a] number of carriers have a very severe problem right now, caused by 100 years of incremental regulation, in that they are carrying large amounts of interline traffic at less than the out-of-pocket cost to haul it. The surcharge section is meant to give them a chance to get out of that bind. . . .

126 Cong.Rec. 24,832 (1980) (statement of Rep. Staggers). As evidenced by its sunset provision, the § 10705a surcharge was a temporary solution only. *See* H.R.Conf. Rep. No. 1430, *supra*, at 112; H.R.Rep. No. 1035, 96th Cong., 2d Sess. 42 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3978, 3987. This provision, which gave time-limited retrospective relief to carriers stuck in traditional joint rates, is not a clear prohibition against future efforts by carriers to enter into concurrences allowing for unilateral adjustments.

Reliance on the principle of *expressio unius* can be troublesome under *Chevron*. *See Cheney R.R. Co. v. ICC*, 902 F.2d 66, 68–69 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 519, 112 L.Ed.2d 530 (1990). Because § 10705a dealt only with traditional joint rates not unilaterally adjustable, and not with rates containing general concurrences for adjustments, its implications for the latter are far from clear. In short, in enacting § 10705a, Congress did not express a clear intent to preclude the creation of MIFTRs.

■ The Society's final argument under the first *Chevron* test is that Congress, in passing the Staggers Act, "ratified the long-standing and well-entrenched standards applicable to joint rates." This doctrine of ratification holds that when Congress reenacts, without change, statutory terms that have been given a consistent

judicial or administrative interpretation, Congress has expressed an intention to adopt that interpretation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381–82 & n. 66, 102 S.Ct. 1825, 1840–41 & n. 66, 72 L.Ed.2d 182 (1982).

■ Prior to passage of the Staggers Act, both the courts and the Commission consistently held that adjustments to joint rates required the concurrence of the participating carriers. *See, e.g., ICC v. Columbus & Greenville Ry. Co.*, 319 U.S. 551, 553, 555, 63 S.Ct. 1209, 1210, 1211, 87 L.Ed. 1580 (1943); *Petition for Declaratory Order—Superphosphate*, 358 I.C.C. 39, 41 (1978). In enacting the unilateral surcharge provisions of § 10705a and expediting proceedings to adjust joint rates, Staggers Act § 218, 49 U.S.C. § 10705(f)(1), Congress recognized that "[u]nder existing law, unless all carriers participating in the joint rate concur, these rates and divisions can be changed only by protracted proceedings before the Commission." H.R.Conf. Rep. No. 1430, *supra*, at 111. Seizing on Congress's affirmative recognition of this law and on the fact that Congress made only limited changes in it, the Society argues that Congress has ratified or reenacted it.

The doctrine of ratification or reenactment has little applicability in the instant case, however, because, prior to the enactment of the Staggers Act, no judicial or administrative decision had addressed the precise question at issue, which is whether an MIFTR is a permissible form of joint rate. The legislative history cited by the Society simply reenforces what already has been conceded as undeniable: Congress had traditional joint rates in mind when it enacted the Staggers Act. Yet, as stated earlier, this cannot be equated with a clear intent that the traditional form be the exclusive form.

■ The second step under *Chevron* requires that we affirm the Commission's conclusion that an MIFTR is a joint rate if it is "based on a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. at 2782. The Commission's conclusion does not have to be the one we would have reached in the first instance. *Id.* at 843 n.

11, 104 S.Ct. at 2782 n. 11. It need only be reasonable. *Id.* at 844–45, 104 S.Ct. at 2782–83.

■ We find the Commission's conclusion clearly reasonable in the light of Congress's expressed intent in both the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 ("4R Act") and the Staggers Act to reduce regulatory constraints on rail rates. Both the 4R and Staggers Acts identified excessive rate regulation as a cause of the financial plight of the railroad industry. *See* S.Rep. No. 499, 94th Cong., 1st Sess. 10 (1975), *reprinted in* 1976 U.S.C.C.A.N. 14, 24; H.R.Conf.Rep. No. 1430, *supra*, at 89. One purpose of the 4R Act was to eliminate protracted regulatory proceedings concerning divisions disputes by providing for simplified and expedited treatment. 4R Act § 201; *see* S.Rep. No. 499, *supra*, at 8–10. As noted in that Senate Report:

> If railroads are to regain lost traffic, or even to retain present traffic, they must be able to lower their rates, innovate new services, and respond to new and changing circumstances. If railroads are to increase their revenues and attract the resources necessary to revitalize the industry, they must be able to raise their rates in a timely fashion....

*Id.* at 11. The Staggers Act took the deregulatory effort further. *See* H.R.Rep. No. 1035, *supra*, at 38. In enacting the Staggers Act, Congress announced a new rail transportation policy which mandated, in part, that competition and demand for services be allowed to establish rates to the maximum extent possible and that federal regulatory control be minimized. Staggers Act § 101(a), 49 U.S.C. § 10101a(1), (2).

The Commission's conclusion that an MIFTR is a permissible form of joint rate is consistent with these congressional enactments. MIFTRs diminish the need for regulatory intervention by the Commission. By agreeing beforehand to allow unilateral adjustments, carriers participating in an MIFTR obviate the need for protracted proceedings for divisions disputes and cancellations. Moreover, by agreeing to allow unilateral adjustments, carriers retain the flexibility to react to competition and the

demand for services. It would be incongruous, indeed, to interpret the carriers' efforts to avoid in this manner the problems that the 4R and Staggers Acts were attempting to remedy as inconsistent with those Acts.

Of course, as the Society asserts, protection of shippers' interests continues to be a purpose of the Act. However, the Commission's decision does not infringe impermissibly on that protection. Treating an MIFTR as an allowable form of joint rate does not remove it from regulatory scrutiny; it is subject to challenges of unreasonableness and discrimination that apply to a joint rate. *See* 49 U.S.C. §§ 10701(a), (c), 10701a(b), 10707(a). Whether such scrutiny might on a particular occasion prove to be insufficient is not presently before us. We are concerned only with the general validity of MIFTRs as joint rates.

The Society's remaining contentions are not persuasive. The Commission's decision does not make a "cynical hoax" of its competitive access rules, 49 C.F.R. §§ 1144.1–1144.6, adopted in *Intramodal Rail Competition*, 1 I.C.C.2d 822 (1985), *aff'd, Baltimore Gas & Elec. Co. v. United States*, 817 F.2d 108 (D.C.Cir.1987), because the rules will continue to apply to joint rate cancellations. Even if resort to the competitive access rules is diminished, this would be consistent with Congress's overarching intent to decrease regulatory intervention.

■ We are not persuaded by the Society's argument that the Commission's decision is inconsistent with the antitrust exemptions of § 10706 because it confers antitrust immunity on the discussions of participating carriers concerning MIFTRs that would not otherwise exist. It is not clear that immunity would not otherwise exist, given § 10706's grant of immunity to discussions between rail carriers "practicably participat[ing]" in a "particular interline movement". The Society has not pointed us to any authority indicating that Congress intended to limit the phrase "interline movement" in this section to a movement under a traditional joint rate, and we refuse to elevate this uncertainty into a conclusion that the Commission's decision is unreasonable.

■ The Society's final argument is that the instant ruling was an unexplained departure from prior Commission decisions. It is well settled that "[d]ivergence from agency precedent demands an explanation." *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C.Cir.1989). If, however, "we determine that the Commission 'has not in fact diverged from past decisions, [then] the need for a comprehensive and explicit statement of its current rationale is less pressing.'" *Cross–Sound Ferry Services, Inc. v. ICC*, 934 F.2d 327, 329–30 (D.C.Cir. 1991) (quoting *Hall*, 864 F.2d at 872). In such a case, the path of the Commission's reasoning need only be reasonably discernible. *Id.* at 330.

The Commission did not depart from precedent. The numerous decisions cited by the Society for the proposition that unilateral adjustments to a joint rate are impermissible did not deal with the situation presented by an MIFTR, where the participating carriers expressly agree to allow such adjustments. As the Commission stated in its decision:

> Though we have often stated broadly that unilateral independent action is impossible in the joint rate context, the cases in which those statements were made did not squarely raise the issue with which we are confronted in the present case: whether a through rate that lacks a specific concurrence requirement can be a joint rate, assuming that it is subject to a general, up-front concurrence and that it possesses the other attributes of a joint rate.

The Commission's decision in *Single–Shipment Minimum Charges, South Western Area, MWMFB*, 367 I.C.C. 875 (1983), was not contrary to its decision herein. In *MWMFB* the Commission held certain minimum charge exceptions published by a rate bureau on behalf of individual carriers unlawful as applied to joint rates because they lacked the concurrence of the other carriers. In so holding, the Commission rejected the argument that general powers of attorney given the rate bureau by the carriers satisfied the concurrence requirement. However, unlike the concurrences in an MIFTR, the general powers of attorney given the rate bureau

in *MWMFB* were not agreements permitting unilateral adjustments by other carriers. Moreover, as the Commission recognized, reading *MWMFB* as precluding MIFTRs would be in tension with the Commission's decision in *Petition to Delay Application of the Direct Connector Requirement to Joint Rail Rates in General Increases*, 367 I.C.C. 886 (1983), decided thirteen days after *MWMFB*, which recognized as an alternative to traditional joint rates "the 'independent factor' system of joint rates now being tried on an experimental basis by several railroads." *Id.* at 895.

In sum, an MIFTR arrangement is compatible with the intent of Congress as expressed in the language, structure and legislative history of the Act as amended. The Commission reasonably rejected petitioner's plea to freeze the former regulatory approach and historical practice in the industry as *the* legal requirement.

The Society's petition for review of the Commission's decision is denied.